## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| **HAROLD GERNSBACHER, JR.,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| vs. | § | |
| | § | |
| **WPCP DISTRIBUTORS, LLC, JUMA** | § | |
| **ELAJOU, and WELLNESS AND** | § | |
| **PERSONAL CARE PRODUCTS** | § | |
| **INTERNATIONAL, LLC** | § | |
| | § | |
| *Defendants* | § | |
| | § | |
| **WPCP DISTRIBUTORS, LLC,** | § | **Civil Action No. 4:21-cv-00893-P** |
| | § | |
| *Third-Party Plaintiff,* | § | |
| | § | |
| vs. | § | |
| | § | |
| **THE FAMILY FOUNDATION d/b/a** | § | |
| **THE KEEP FAMILIES GIVING** | § | |
| **FOUNDATION, JEWISH FUNDERS** | § | |
| **NETWORK, ALEX JAKUBOWSKI,** | § | |
| **and DELEGATION OF JEWISH** | § | |
| **AMERICAN STUDENTS d/b/a** | § | |
| **KAHAL,** | § | |
| | § | |
| *Third-Party Defendants.* | § | |

## HAROLD GERNSBACHER, JR.'S FIRST AMENDED COMPLAINT

TO THE HONORABLE JUDGE MARK PITTMAN:

NOW COMES Plaintiff Harold Gernsbacher, Jr. ("***Plaintiff***" or "***Gernsbacher***") and files

this *Amended Complaint* against WPCP Distributors, LLC ("***WPCP***"), Wellness and Personal Care

Products International, LLC ("***WPCPI***"),[1] and Juma Elajou ("***Elajou***") (collectively, "***Defendants***"). In support, Gernsbacher shows the Court as follows.

> "***The Federal Bureau of Investigation is providing this industry alert to warn government and health care industry buyers of rapidly emerging fraud trends related to procurement of personal protective equipment (PPE), medical equipment such as ventilators, and other supplies or equipment in short supply during the current COVID-19 pandemic***."

- FBI Press Release, April 13, 2020 (emphasis added).[2]

## I.

## Introduction

1.      This lawsuit involves Gernsbacher's efforts to recover funds provided for the purchase and delivery of personal protective equipment. At the request of Defendants, Gernsbacher wire transferred $848,750.00 on April 7, 2020 for the purchase and delivery of personal protective equipment, which to this day has not been delivered. Despite Defendants' false promises to return the funds, they have failed and refused to do so. As a result, Gernsbacher filed this lawsuit in the 342nd District Court, Tarrant County, Texas in October 2020. Shortly thereafter, Elajou fled to the United Arab Emirates, caused WPCP to file an answer and assert counterclaims and cross-claims on his behalf, and personally filed a special appearance disclaiming any knowledge of any contacts with Texas. Plaintiff conducted discovery during which Elajou refused to disclose material documents and information and provided false testimony during his Zoom

---

[1] By this pleading, Gernsbacher asserts no new causes of action or grounds for liability against WPCPI, which is the subject of a May 6, 2021 *Partial Default Judgment* entered by the 342nd District Court, Tarrant County, Texas (the Court from which this action was removed by Defendants WPCP and Elajou). [Doc. 4-17.]

[2]     https://www.fbi.gov/news/pressrel/press-releases/fbi-warns-of-advance-fee-and-bec-schemes-related-to-procurement-of-ppe-and-other-supplies-during-covid-19-pandemic

deposition from a chair in the UAE. On July 27, 2021, days before the hearing on Elajou's special appearance, Defendants WPCP and Elajou removed the case to this Court. Gernsbacher files this *Amended Complaint*, and requests relief as set forth herein below.

## II.

## Parties

2.    Harold Gernsbacher, Jr. is an individual and resident of the State of Texas. Gernsbacher is the assignee of Jewish Funders Network, a Pennsylvania non-profit corporation ("***JFN***"), Delegation of Jewish American Students (DOJAS), an Illinois non-profit corporation dba KAHAL ("***KAHAL***"), Alex Jakubowski ("***Jakubowski***"), The Family Foundation dba The Keep Families Giving Foundation ("***KFG***"),[3] the COVID-19 Healthcare Response Fund ("***PPE Fund***") (a division of KFG),[4] and Lina Constantinovici ("***Constantinovici***"), as to all claims related to the matters set forth herein, by virtue of written assignments executed prior to the filing of this *Amended Complaint*. *See* Exhibit "A".

3.    WPCP Distributors, LLC is a Delaware limited liability company with its principal place of business and office located at 9350 Trade Place, Ste. B, San Diego, CA 92126, and made an appearance in the State court proceeding and in this matter by the filing of its original answer, counterclaims, cross-claims, third-party claims, and its Notice of Removal and associated filings in this matter.

4.    Wellness and Personal Care Products International, LLC is a foreign limited liability company formed under the laws of the United Arab Emirates with its principal place of

---

[3] KFG is a Texas nonprofit corporation with its principal place of business and office located at 10415 Morado Circle, Building 1-310, Austin, Travis County, Texas 78759
[4] The PPE Fund, as a division of KFG, shares its principal place of business and office in Austin, Travis County, Texas 78759

business and office located at 9350 Trade Place, Ste. B, San Diego, CA 92126 (though it engaged in business in Texas, it does not maintain a regular place of business in the State of Texas, has not designated an agent for service of process in the State of Texas, and is not registered or authorized to do business in the State of Texas [or, upon information and belief, anywhere in the United States]). Wellness and Personal Care Products International, LLC was served by substituted service on the Texas Secretary of State, but failed to file an answer or otherwise make any appearance. On May 6, 2021, the 342nd District Court, Tarrant County, Texas (the Court from which this action was removed by Defendant WPCP), entered a *Partial Default Judgment* as to Wellness and Personal Care Products International, LLC. [Doc. 4-17.]

5.      Juma Elajou is an individual and resident of the State of California. Elajou, as the alter ago of WPCP, made an appearance and submitted to personal jurisdiction in Texas. However, Elajou disputes those facts and filed a *Special Appearance* in the 342nd District Court, Tarrant County, Texas, and, upon Defendants' removal, filed in this matter a *Motion to Dismiss* pursuant to FRCP 12(b)(2) (challenging personal jurisdiction). [Doc. 26.]

## III.

### Jurisdiction and Venue

6.      This Court has jurisdiction over this suit pursuant to 28 U.S.C. § 1332 (diversity of citizenship) and has been removed to this Court by Defendants WPCP and Elajou based on 18 U.S.C. §§ 1441 and 1446 on grounds that (1) this action is pending within the jurisdiction of the United States District Court for the Northern District of Texas, (2) this action is between citizens of different states who are completely diverse, and (3) the amount in controversy exceeds $75,000 exclusive of interest and costs.

7.      This Court has personal jurisdiction over WPCP because this suit concerns acts

4

which occurred in the State of Texas, WPCP entered into a contract performable in Texas, construed and governed by the laws of the State of Texas, and providing that any dispute pertaining to the contract shall be brought exclusively in a court within the State of Texas, WPCP conducted business in the State of Texas, committed tortious or fraudulent conduct during the course of entering into and/or performing that contract, and WPCP has made a general appearance and pursued counterclaims and third-party claims in this matter.  Elajou is the sole managing member, operator and agent of WPCP.

8.      This Court has personal jurisdiction over WPCPI because this suit concerns acts which occurred in the State of Texas, WPCPI entered into a contract performable in Texas, construed and governed by the laws of the State of Texas, and providing that any dispute pertaining to the contract shall be brought exclusively in a court within the State of Texas.  WPCPI conducted business in the State of Texas and committed tortious or fraudulent conduct during the course of entering into and/or performing that contract.

9.      This Court has personal jurisdiction over Elajou because WPCP and Elajou are alter egos, and WPCP voluntarily submitted to personal jurisdiction in the State of Texas. Elajou completely controls WPCP, is the sole manager of WPCP, and testified during his deposition: "I operate the company." WPCP was under-capitalized and both WPCP and Elajou possessed absolutely no funds in their accounts until they received the funds at issue in this proceeding (in addition to other funds fraudulently procured from the State of Michigan). WPCP and Elajou exhibit an unusual degree of financial integration – Elajou used WPCP's funds as his own personal property and to pay his personal obligations, repeatedly associated WPCP and personal bank accounts with each other, and transferred funds between and among them. The entirety of Elajou's use of WPCP reveals that he treats WPCP as an extension of his own personal interests. Using the

required totality of the circumstances analysis, these allegations satisfy the "less stringent" burden (compared to a showing necessary to secure ultimate liability) for piercing the corporate veil to establish personal jurisdiction over Elajou. Thus, just as WPCP is subject to the Court's personal jurisdiction, Elajou is an alter ego of WPCP for jurisdictional purposes and, therefore, is subject to the Court's exercise of personal jurisdiction over him. In addition, this suit concerns acts which occurred in, were directed towards, the State of Texas. Elajou, acting individually and in the capacity of corporate agent and representative of WPCP and WPCPI, knowingly entered into a contract performable in the State of Texas and directed toward the State of Texas. Elajou (individually and as agent and alter ego of WPCP and WPCPI) conducted a scheme to defraud Plaintiff and his agents and ultimately steal money from Plaintiff, which was largely conducted via electronic media. Elajou's communications directed at Texas were not random, fortuitous, or attenuated, and his tortious acts occurred in Texas, the effects of Elajou's tortious acts were felt in Texas, and the tortious acts were purposefully directed toward Texas. Elajou intentionally engaged in tortious and fraudulent conduct while acting within and outside his capacity as a manager and/or officer of WPCP and WPCPI during the course of entering into and/or purporting to perform the contracts described herein for the purpose, at least in part, of dispossessing Plaintiff (a Texas resident) of $835,248.75. More specifically, Elajou (individually and as agent and alter ego of WPCP and WPCPI) and his representatives represented the services and abilities of Elajou, WPCP and WPCPI to supply personal protective equipment to the Texas-based KFG/PPE Fund. Elajou and his representatives initiated and promoted communications and dealings with Plaintiff's agents in Texas in furtherance of soliciting the supply of PPE to the Texas-based KFG/PPE Fund. In those communications, Elajou and his representatives fraudulently misrepresented the services and abilities of Elajou, WPCP and WPCPI to supply personal protective equipment (*i.e.*, gowns) to the

Texas-based KFG/PPE Fund. Elajou (individually and as agent and alter ego of WPCP and WPCPI) negotiated, prepared and provided the WPCP/WPCPI purchase order documentation at issue establishing WPCP's agreement to supply personal protective equipment (gowns) to the Texas-based KFG/PPE Fund, which included delivery to a PPE distributor in Texas. Elajou (individually and as agent and alter ego of WPCP and WPCPI) fraudulently misrepresented the terms of the contract for the sale of the gowns, and misrepresented his intention to honor the terms of the contract, which was to be performed, in part, in Texas. Elajou knew the purchase funds of $835,248.75 were held in an IOLTA account of a Texas-based lawyer for a Texas-based charitable Texas-based KFG/PPE Fund. Those funds were paid to WPCP at the direction of Elajou for the purported purpose of delivering personal protective equipment to a distributor in Texas and for the benefit of the Texas-based KFG/PPE Fund. Instead, Elajou stole and spent the funds for his own personal benefit immediately upon receipt of the funds, despite his contractual agreement, obligation and duty to act as a fiduciary and to hold said funds in an escrow account, all to the injury of Plaintiff. Elajou (individually and as agent and alter ego of WPCP and WPCPI) continued to engage in such misconduct during the following months, while contemporaneously seeking and obtaining contracts with the government of the State of Texas for the delivery of personal protective equipment and seeking additional contracts within the State of Texas for similar deliveries of personal protective equipment. Elajou's intentional acts of soliciting, preparing and causing a purchase order to be delivered, executed and returned to him in furtherance of his schemes herein and agreement to deliver personal protective equipment to a distributor in the State of Texas (while seeking and obtaining additional contracts with the government of the State of Texas) in exchange for the delivery of funds from a Texas IOLTA account held for the Texas-based KFG/PPE Fund that he intended and immediately used for his own personal benefit and the

benefit of his family members were all purposeful (not fortuitous) and were designed to seek some benefit, advantage, or profit by doing so in the forum of the State of Texas. In addition to the Court's personal jurisdiction over Elajou for his intentional tort claims, this Court maintains pendent personal jurisdiction as to all other non-tort claims against Elajou as they each arise out of the same nucleus of operative facts. As such, Elajou purposefully availed himself of being haled into Texas courts based upon his contacts and conduct, and this court has specific jurisdiction over Elajou. These acts were directed toward Texas and their effects felt here in Texas; such actions necessarily subject Elajou to personal jurisdiction in a Texas court.

10.    Venue in this Court was established by Defendants' removal in accordance with 28 U.S.C. §1441(a), in that this Court is the United States District Court for the district and division corresponding to the venue where the original state-court action was filed, *i.e.*, Tarrant County, Texas.

### IV.

### <u>Facts</u>

11.    At the outset of the 2020 COVID-19 global pandemic, Gernsbacher became involved in charitable efforts to source and supply specific compliant personal protective equipment ("***<u>PPE</u>***") for hospitals, nursing homes and healthcare providers in need of PPE during the COVID-19 global pandemic. In early March 2020, Gernsbacher engaged KAHAL and Jakubowski (Executive Director of KAHAL) as his agents to source, acquire, and distribute PPE for nursing homes and residential care facilities serving the Jewish community.

12.    At the same time, a nascent philanthropic fund – the PPE Fund – was created by Constantinovici, KFG, Chelsea Toler-Hoffman ("***<u>Toler-Hoffman</u>***") (President of KFG), and Lori Katz ("***<u>Katz</u>***") (a "strategic advisor" to KFG and its "Impact Investing Chair") related to sourcing

and providing PPE to aid in defeating the COVID-19 pandemic and saving lives. They referred to their PPE Fund, in varying terms, as the COVID-19 Healthcare Response Fund (a division of KFG).

13.    On or about **March 21, 2020**, Constantinovici encountered a NEXUS Global[5] Facebook group ("***NEXUS FB Group***") post expressing a need for PPE in response to the COVID-19 pandemic. She posted a responsive comment expressing an interest in helping with sourcing PPE in conjunction with the PPE Fund. On the same or following day, Jakubowski replied to her post and expressed a need of JFN and KAHAL for PPE for use in approximately 150 nursing homes. Jakubowski also emailed Constantinovici that he had coordinated the distribution side (Chain Link Services, LP ["***Distributor***"]) previously owned by Gernsbacher – both located in Texas), but needed to coordinate a supply chain. Jakubowski described the PPE needs of nursing homes and residential care facilities with which he and KAHAL were working on behalf of Gernsbacher, and expressed certain PPE that he needed, asked for a list of available PPE products, and expressed a sense of urgency, including that COVID-19 cases in the nursing homes had increased 5 times in a matter of days. Jakubowski asked Constantinovici's capacity for production and distribution of PPE and thereafter conducted some due diligence by contacting one or more members of "NEXUS" to substantiate the credentials of Constantinovici who vouched for same.

14.    Contemporaneously therewith, Constantinovici was approached by Paige Sanborn ("***Sanborn***") who was also a member of NEXUS Global with an offer to source PPE through Elajou. Sanborn was initially the primary person Constantinovici communicated with regarding the types of PPE available through Elajou. Sanborn and Elajou created a perception in Constantinovici that Sanborn either worked for Elajou or with him as WPCP/WPCPI/Elajou's

---

[5] "NEXUS" is a network of investors and philanthropists (www.nexusglobal.org).

representative. Sanborn also sent Constantinovici promotional materials on one of the many companies purportedly owned by Elajou's family.

15.      Jakubowski also posted his own solicitation to the NEXUS FB Group, requesting leads for potential PPE supply sources. Toler-Hoffman, President of KFG, replied to the post, commented, and offered to "do a call to explain how [the PPE solution she organized] was working . . . ." Toler-Hoffman discussed the above with Katz, and Katz participated in a conference call with Constantinovici to inform Jakubowski about KFG and the PPE Fund and their access to supplier(s) of PPE, including gowns.

16.      On or about **April 1, 2020**, after Constantinovici assisted Jakubowski in locating COVID-19 testing supplies and facilitated the sale of 500,000 N95 masks (supplied from a third-party unrelated to this lawsuit), Jakubowski expressed the need for approximately 200,000 "sterile, non-reinforced, disposable surgical gowns" and asked Constantinovici whether she had a preferred vendor for the disposable surgical gowns.

17.      Constantinovici asked Elajou and Sanborn whether their proposed PPE sales included gowns. Elajou and Sanborn advised that they could produce up to 200,000 gowns for immediate delivery that would originate in Dubai, United Arab Emirates ("_**UAE**_") and their primary contact in the UAE (named "Paul") was working on shipping arrangements.

18.      Constantinovici told Jakubowski that KFG/PPE Fund had a Middle East supplier for Level 2 gowns from a manufacturer that had them in stock and could ship immediately. Jakubowski responded that Gernsbacher could not accept gowns from China, and Constantinovici replied that "[t]hey can very likely do 200k [gowns] non China, will have confirmation at 9 pm Pacific when they [_i.e._, "Paul"] wake up and I talk to them[.]" Jakubowski expressed the decision to proceed with an order for 175,000 Gowns from the UAE or general Middle East region.

19.    On **April 2, 2020**, Constantinovici engaged in extensive communications with Elajou, Sanborn, and Toler-Hoffman regarding a plan to order PPE gowns for delivery to the Distributor in Texas. Elajou represented that both his US entity (WPCP) and UAE entity (WPCPI) would be involved. Accordingly, Elajou provided Constantinovici related entity information as to both WPCP and WPCPI, including organizational documents for WPCP and a Commercial License for WPCPI (this latter entity involving "partners" Elajou and a person identified as Ghaleb Saeed Ghaeb Alaskari[6]). Constantinovici forwarded this information to Toler-Hoffman and Katz.

20.    Jakubowski asked Constantinovici whether KFG/PPE Fund had the pricing so that the order could be placed, Constantinovici asked Elajou if he had any information on the pricing for the Gowns and he responded that he was waiting to hear from "Paul" in the UAE for the pricing information. Elajou sent Constantinovici screenshots of what purported to be text messages from "Paul" in the UAE regarding the impending delivery of pricing information. Elajou promised that he would provide the pricing and related information on the Gowns as soon as he received it from "Paul."

21.    That same day, Constantinovici participated in a conference call with Jakubowski and Katz. During the call, Katz and Constantinovici stated that KFG/PPE Fund had a supplier for PPE gowns, but that all orders and funds for the requested PPE gowns must go through 501(c)(3) nonprofit entities (*i.e.*, KFG/PPE Fund and other entities). Referencing both prior orders and the Gowns, Constantinovici advised Jakubowski, "I asked [Katz] to add this [to the] order in the agreement [and] [s]he will have those docs to you before you wake up[.]"

22.    The next day, on **April 3, 2020**, Elajou, Constantinovici, Katz, Toler-Hoffman, and

---

[6] Upon information and belief, a director and/or export manager with Maatouk Factories L.L.C., an Manufacturer in Abu Dhabi, United Arab Emirates (UAE).

others continued to negotiate terms of the potential transaction for PPE gowns. Sanborn sent Constantinovici information for the gowns (that she expressed had been sent her from "Paul" in the UAE), sent Constantinovici the draft purchase order for the gowns (identifying the purchaser as KFG and the PPE Fund) ("***Draft Purchase Order***"), all of which Constantinovici forwarded to Toler-Hoffman (and informed Jakubowski he would be receiving a copy from her). Sanborn also provided additional detailed information on the gowns from the UAE and Middle East region, including non-woven medical grade 30 GSM non-surgical Gowns made by a company named Entero out of India. Constantinovici advised Jakubowski that Toler-Hoffman would be sending the agreement to him and emailed him samples and descriptions of the disposable PPE gowns available for purchase from manufacturer Entero (in India) (*i.e.*, not China), and again required the purchase funds for the PPE gowns be payable to "Keep Families Giving Foundation, Healthcare Response Fund" (*i.e.*, KFG and the PPE Fund, though she provided KFG's EIN number for tax purposes).

23.    At the same time, Jakubowski, Toler-Hoffman, Katz, and Constantinovici worked together in varying degrees to achieve the preparation and execution of appropriate agreements among Gernsbacher, JFN, KAHAL, KFG, and the PPE Fund for the funding and acquisition of the gowns. These included a Pledge Agreement between JFN and KFG ("***Pledge Agreement***") providing for the delivery of funds in the amount of $848,750.00 ("***Funds***") by JFN to KFG for PPE and a Delivery of Goods & Distribution Agreement between KFG and KAHAL ("***Distribution Agreement***"). *See* Exhibits "B" and "C".

24.    Toler-Hoffman sent Jakubowski an email enclosing the draft Pledge Agreement and Distribution Agreement. The Pledge Agreement provided that the PPE Fund was "a pooled philanthropic fund" and agreed to place the Funds into the PPE Fund for use only as described

therein. Pursuant to the Distribution Agreement, KFG/PPE Fund agreed to use the Funds to acquire the following specific PPE from WPCP for delivery to the Distributor in Fort Worth, Texas:

- **175,000 non-woven medical grade 30 GSM non-surgical gowns made by Entero (out of India) (*i.e*., <u>not China</u>), CE, ISO and FDA certified**

("***<u>Gowns</u>***").

25.     During this same time period and simultaneously with discussions regarding the Gowns between Elajou, Sanborn, and Constantinovici, they also were exploring various transactions regarding the procurement, transport, and delivery of **<u>ventilators</u>** to various end users around the globe. Just as with the Gowns, Elajou and Sanborn (and they referenced "Paul" in the UAE) played a similar role in discussing the sourcing and transporting of ventilators by private plane.

26.     On **April 6, 2020**, Elajou again provided his entity information (WPCPI and WPCP) to Constantinovici and Katz. Constantinovici communicated to KAHAL that they awaited the signed Pledge Agreement and Distribution Agreement, looked forward to delivering the 175,000 Gowns to KAHAL, and that Toler-Hoffman would provide wire transfer instructions (Toler-Hoffman provided the instructions within 30 minutes thereafter). Constantinovici communicated with Elajou later that day regarding a plan to finalize scheduling of a private plane for shipment of ventilator units. **Elajou advised that the Gowns would be transported on the same plane(s)**. During these discussions, Elajou invited Constantinovici and her family to visit his family in Abu Dhabi, UAE as Elajou had done with other NEXUS members. Shortly after midnight (early morning April 7), Constantinovici participated in a Zoom call with Elajou and Sanborn regarding the ventilators and related matters.

27.     On **April 7, 2020**, Constantinovici initiated a group text thread with Elajou, Sanborn, Toler-Hoffman, and Katz in order to streamline communication ("***<u>Group</u>***"). Shortly

thereafter, Katz requested a draft purchase order for ventilators and Elajou sent an email to Katz (and copied Sanborn and Constantinovici) with a form WPCPI/WPCP confirmation letter that documented the supplemental terms of the accompanied purchase order. The draft WPCPI/WPCP confirmation letter included the statement:

> '[i]f you have any questions, please do not hesitate to contact us. Paige Sanborn, or myself can be reached directly at + 1.858.829.9303 or by email at juma@elajouig.com (or Paige at +.1.516.647.5175 or pensjp@gmail.com).'

This representation affirmed the partnership/agency relationship between Elajou and Sanborn.

28.     At or about the same time, KAHAL executed its portion of the above-referenced Pledge Agreement and Distribution Agreement and wire transferred funds to KFG for payment for the 175,000 Gowns. Toler-Hoffman sent an email to Jakubowski, JFN, Katz, Constantinovici and Jeffrey Toler ("_**J. Toler**_"), also a KFG principal, with J. Toler's payment instructions for the Gowns to be sent to "our IOLTA account." The IOLTA account referred to was in the name of Elizabeth Morgan & Associates – a law firm located in Austin, Texas and associated with KFG and J. Toler.

29.     Jakubowski communicated to Toler-Hoffman, Katz, and Constantinovici that the wire transfer had been completed to KFG and asked if Elajou and Sanborn would be able to ship the Gowns the following day. Constantinovici texted the Group and asked Elajou for the approximate delivery time for the Gowns (even if they did not make it on one of the planes transporting the ventilators). Elajou responded "7ish days". Elajou also advised Constantinovici that he had 10,000-20,000 Gowns in his Los Angeles ("_**LA**_") warehouse that Elajou could pick up on April 10, 2020 for immediate delivery to the Distributor in Texas. Constantinovici then conveyed to Jakubowski that Elajou and Sanborn had located a supply of Gowns in their LA warehouse and would ship them right away (and that Constantinovici would confirm the number

from Elajou or Sanborn) with the balance coming within seven (7) days from the UAE.

30.    Sanborn also requested the formal purchase order for the Gowns from Katz, so Constantinovici advised Sanborn that she would review the Draft Purchase Order provided by Sanborn and ensure it was executed and delivered. Sanborn said she wanted to get the final purchase order for the Gowns to "Paul" in the UAE so "he can get those out!"

31.    Elajou then texted Constantinovici details on the available local Gowns in LA for intended shipment "for Texas". Elajou also texted a purported screenshot from the owner of the plane overseas claiming he wanted to donate $50,000 of supplies since the cost of the plane would be considerable.

32.    At all times, Elajou/WPCP/WPCPI and Sanborn promised that all of the Gowns would be delivered to the Distributor on an expedited basis – within 7 days – no later than April 14, 2020 ("***Deadline***").

33.    Constantinovici reviewed the draft purchase order provided by Elajou and Sanborn and asked Jakubowski for confirmation of the accuracy of the Distributor's address in Fort Worth, Texas (as reflected on the Draft Purchase Order). Jakubowski confirmed the delivery address and Constantinovici informed Elajou and Sanborn. Elajou then texted Constantinovici that he was going to rest because it was going to be a very long day to finalize the ventilator orders and scheduling of transport via private planes and that he would have an update after a call with the pilot. At the end of the day, Constantinovici forwarded to Elajou the approved purchase order for the Gowns ("***Purchase Order***").

34.    The following morning, on **April 8, 2020**, Toler-Hoffman advised that KFG was ready to wire transfer the purchase amount set forth in the Purchase Order for the Gowns – $835,248.75 ("***Purchase Funds***"). Elajou provided Constantinovici a complete "Purchase

Documents Package" as to the 175,000 level 2 Gowns that contained all of the terms of the transaction, including an invoice with payment instructions ("***Invoice***")[7] and an acceptance letter and order summary to Constantinovici confirming the details of the Purchase Order for the Gowns (but ***from China***) and detailing additional stipulations in connection with the fulfillment of the Purchase Order ("***Confirmation Letter***") (all three documents attached hereto as Exhibit "D") (the Pledge Agreement, Distribution Agreement, Purchase Order, Invoice, and Confirmation Letter are hereinafter referred to collectively as the "***PPE Purchase Agreements***").

35.    Notably, the Confirmation Letter included WPCP in the heading, WPCPI's logo, and the seal of both WPCP and WPCPI stamped on both pages, including next to Elajou's signature as manager of WPCP. The Confirmation Letter also represented that "[u]pon receipt of payment, we will pay the manufacturer using a LPO or secured escrow account" and the "funds will only be released to the manufacturer upon satisfactory physical inspection and confirmation by SGS[8] or a qualified inspection agency, at time of loading items onboard the private charter plane(s)" ("***Escrow Requirement***"). The Confirmation Letter also includes the following express terms: "In the event that delivery of the order is not possible due to **unforeseen circumstances** uncontrollable by either Party, [WPCP/WPCPI] shall refund amounts paid[,] to [KFG]" ("***Supply Agreement Refund Terms***").

36.    Constantinovici asked that Toler-Hoffman submit the wire transfer request for payment of the Purchase Funds. KFG took steps to transfer the Purchase Funds (also referred to

---

[7] It is notable that the Invoice was issued by WPCPI, directed payment be wire transferred to WPCP, and included the seal of both WPCP and WPCPI stamped on its face.
[8] SGS is a Swiss multinational company headquartered in Geneva, Switzerland which provides inspection, verification, testing and certification services.

herein as the "***Transferred Funds***" or "***Stolen Funds***") to WPCP pursuant to the PPE Purchase Agreements for purposes of purchasing the PPE Gowns.

37.    Meanwhile, the participants in the Group text continued to discuss various potential transactions, including as to the sourcing and transport of ventilators. Elajou texted the Group that he identified availability of 115 ventilators at a factory that required them to lock in the price of over $6,500,000. Elajou said it would involve no profit, but would get ventilators to people who need them. Elajou asked Constantinovici whether she, Toler-Hoffman, and Katz had relationships with the State of Texas. Constantinovici informed Elajou that she had been on a call earlier in the morning with 20 people with the State of Texas for discussing their PPE needs.

38.    Jakubowski asked Constantinovici for the cost of expedited overnight delivery on the Gowns. Constantinovici asked Elajou for the pricing of expedited delivery and delivery times and informed him that it was approved to send the Gowns to Texas via regular mail. Elajou responded "you got it!"

39.    By the evening, Elajou expressed his thought to Constantinovici that the orders for ventilators would need to be large to justify the cost of fuel and that the short timeframe and size of the transaction made it unlikely to get a deal done on ventilators. Very late that night, sometime after midnight, Elajou texted the Group that he could get better pricing if they could aggregate orders for 230+ ventilators. Sanborn stated the same that she and Elajou could get 230 units in 10-12 days and that "Paul" (from the UAE) was holding them for Elajou and Sanborn. Sanborn also said they could do two planes for drop-offs in two locations. Elajou stated again that he had 100 units waiting in "the warehouse" for pick-up as soon as payment is received. The Group continued to text each other as to the respective efforts to aggregate orders for ventilators. In response to an inquiry from Toler-Hoffman, Elajou texted that a Gulfstream G650 (located in Shanghai) would

17

be available for transport of ventilators. At the time, Constantinovici made contact with personnel in the United Kingdom ("*UK*") that expressed interest in ventilators and Elajou and Constantinovici communicated as to various details. Elajou continued to work on finalizing a deal on ventilators before the end of the day. Elajou texted the Group a screenshot purportedly showing a jet crew or pilot claiming that funds would need to be wired by the following day for a departure early next week. Elajou texted that money needed to be paid to obtain a slot for departure. Constantinovici's contacts in the UK informed her of a potential order for ventilators that evening. Elajou sent another screenshot from the purported jet crew or pilot that they needed to act quickly or they would lose their departure window. Sanborn also communicated to the Group that the State of Michigan may issue an order for ventilators, as well (which could be added to the flight). Throughout this time, Constantinovici, Toler-Hoffman (and KFG), Katz, Jakuboski, Gernsbacher and other believed that WPCP/WPCPI/Elajou (and Sanborn) were working on fulfilling the Purchase Order in compliance with the Invoice and Confirmation Letter.

40.    Elajou also asked Toler-Hoffman whether she knew Cody Hayes at Texas State (Toler-Hoffman said she was a PhD student at Texas State). Coincidentally, Cody was one of the people Constantinovici and Katz had been communicating with at the State of Texas the prior day. In fact, Cody had emailed Constantinovici the prior day about PPE needs. Constantinovici communicated this to Elajou and Toler-Hoffman also texted the Group that Cody is the Unit Chief for Disaster Finance in the Texas division of emergency management. Elajou informed the Group that he was awaiting a purchase order from the State of Texas for PPE masks. Throughout this time, Constantinovici, Toler-Hoffman (and KFG), Katz, Jakuboski, Gernsbacher and other believed that WPCP/WPCPI/Elajou (and Sanborn) were working on fulfilling the Purchase Order in compliance with the Invoice and Confirmation Letter.

41.    On **April 9, 2020**, in the afternoon, Elajou asked Constantinovici about the status of the KFG wire transfer of the Purchase Funds for the Gowns. KFG confirmed the wire transfer in the late afternoon and Jakubowski asked Constantinovici to confirm shipment and tracking of the Gowns. Constantinovici informed Elajou and asked that he confirm his receipt of the Purchase Funds and provide her tracking numbers once he processes the order for the Gowns. Elajou's response was to thank Constantinovici, inform her that he would get to it after resolving and securing the <u>ventilators</u>, and assured that he would send copies of invoices, fulfillment schedules, packing lists, and shipper's insurance.

42.    Elajou then turned back to the <u>ventilators</u> and asked Constantinovici about the status of the UK order. Constantinovici advised Elajou that the UK government was prepared to issue an order and payment, but first needed certain product and related information requested by before it would issue an order. Elajou sent Constantinovici various documents and Constantinovici forwarded them to her contacts in the UK government.

43.    On **Friday, April 10, 2020**, unknown to Plaintiff (or any of his assignors), bank records reveal that WPCP/WPCPI/Elajou had zero balances in their bank accounts at the time they received the Purchase Funds in their account and immediately violated every provision in the PPE Purchase Agreements. On the day of receipt, Elajou transferred <u>**all**</u> of the Purchase Funds to **two of his personal checking accounts, another WPCP savings account, and an account for Elajou Investment Group, paid his credit card, and paid his wife**. Absolutely <u>**none**</u> of the Purchase Funds were used to purchase any PPE Gowns.

44.    Jakubowski asked Constantinovici several times that day regarding the tracking numbers for the Gowns and advised that the Distributor would need to know delivery time(s) in order to plan accordingly. Constantinovici asked Elajou for any news on the shipment of the

Gowns. After an hour of no response from Elajou, Constantinovici again informed Elajou that Jakubowski was concerned about not having the tracking numbers for the deliveries from the LA warehouse and the UAE. Elajou finally responded and claimed to have asked an employee, a driver named "PJ Paige", to drive the LA warehouse portion of the Gowns to Texas the next day to Texas and would have them at the Distributor's logistics warehouse in the next 48 hours. Elajou sent PJ Paige's contact info to Constantinovici to share with Jakubowski in case of emergency. Constantinovici provided Jakubowski this information and the contact information for PJ Paige in case of emergency.

45.    Jakubowski inquired whether the Distributor could just pick up the PPE Gowns and Constantinovici conveyed that inquiry to Elajou. Elajou represented to Constantinovici that logistics made a pick-up difficult because his "guys will be out of town" and so Elajou suggested UPS or a trucking company the following day. Constantinovici conveyed Elajou's suggestions to Jakubowski. Jakubowski chose UPS, but by then according to Elajou the last pick-up had passed. Elajou suggested he would pay someone to truck it overnight if the Distributor would be available the following day (Saturday, April 11, 2020) or just ship the next day regular UPS Ground. Jakubowski and Constantinovici agreed for overnight transport by PJ Paige and advised Elajou as to same. Elajou then texted Constantinovici that PJ Paige may not be able to drive for delivery the following day as he may have taken another shift.

46.    At the same time, Elajou again focused on the **ventilators** and informed Constantinovici **that Michigan had ordered 50 ventilators**, which combined with an order for 70 ventilators from UK, making the load necessary for a full plane. Coincidentally, on this same day that Elajou received and misappropriated the Purchase Funds, he received and misappropriated

$2,661,268.75 from the State of Michigan for the ventilator order and transferred some or all of it to his personal accounts.

47.    Elajou texted Constantinovici that the plane was booked pending final clearance documentation, and that he had secured a back-up cargo plane in the event the private plane was not cleared. Constantinovici offered assistance, but Elajou stated "it's all Paul" and repeatedly referenced "Paul's" involvement in the overseas logistics. Very late that evening, Sanborn advised Constantinovici that she and Elajou just got off the phone with "Paul" in UAE to organize the UK order for ventilators, and that they were going to talk again in an hour to get the paperwork done on what amounted to a $24 million deal. Unfortunately, the following morning Elajou and Sanborn advised that the UK order was not finalized and they needed an additional order in that amount in order to fill the plane for cost efficiencies (Sanborn said Michigan's order of 50 ventilators was all they had at the time).

48.    In addition to being more focused on securing orders for ventilators than complying with the PPE Purchase Agreements or placing the Purchase Funds in escrow pending acquisition of the PPE Gowns, Elajou remained focused on securing business from the State of Texas. Elajou also informed the Group that he received a first purchase order from the State of Texas for PPE masks and he expected another purchase order later in the day.

49.    On **Sunday, April 12, 2020**, Jakubowski again asked Constantinovici for the tracking numbers for the Gowns – both from LA and the UAE. Constantinovici informed Elajou that Jakubowski was requesting the tracking numbers again. Elajou said "Paul" would have to answer the question as to the Gowns in the UAE, but that the Gowns in LA were still at the warehouse because UPS did not do a Saturday pick-up "like they usually do." Elajou told Constantinovici that Tuesday or Wednesday delivery should not be a problem.

50.     The following day, **Monday, April 13, 2020**, Jakubowski again called and texted Constantinovici and asked for tracking numbers for the Distributor to make plans. Jakubowski again called and texted Constantinovici later in the day asking again. Constantinovici texted Sanborn, informed her that Constantinovici had received two more calls about the Gowns and asked that Sanborn provide "at least one tracking number." Sanborn responded to Constantinovici that Elajou requested the tracking information from his brother and they were awaiting that information. Jakubowski contacted Toler-Hoffman to see if she had the UAE tracking information (she did not). Two hours later, Constantinovici again texted Sanborn that she needed at least one tracking number and expressed her impression that Jakubowski may cancel the order for the Gowns. Constantinovici told Sanborn that she had no other explanation for Jakubowski. Sanborn responded to Constantinovici that Elajou would get that information to her right away and that she would call Elajou. Sanborn suggested Constantinovici also call Elajou. Constantinovici tried to call Elajou, but her call went straight to his voicemail. Constantinovici informed Sanborn of this effort and Sanborn texted Constantinovici that she also tried to call, text, and email Elajou to no avail. Constantinovici also texted Elajou and let him know that Jakubowski had "called [her] 12 times since this morning." Elajou did not respond to Constantinovici.

51.     Elajou's lack of responsiveness put Constantinovici in a difficult position. Constantinovici did not want to ignore Jakubowski, so she responded to Jakubowski that ground transportation was experiencing delays and the Gowns would be delivered by the driver from the LA warehouse for delivery on Tuesday or Wednesday (based upon what Elajou last told Constantinovici the prior day). Jakubowski asked Constantinovici if the larger shipment of Gowns from UAE was still on track to arrive that week. Constantinovici texted Jakubowski that she must have texted Elajou and Sanborn 25 times asking for the tracking information (which had been

22

unavailable allegedly per Elajou and Sanborn because "DHL was down"). and suggested a Saturday or Sunday arrival from the UAE based on what little information she had at the time.

52.     Later that night, Constantinovici again texted Elajou three times and asked whether PJ Paige would be leaving in the morning from the LA warehouse with that portion of the Gowns and if he had any news from "Paul" in the UAE about the tracking number on Gowns. Elajou responded to Constantinovici's text messages about other transactions, including <u>ventilators</u>, but did not respond to her texts about the Gowns. Constantinovici sent yet another text to Elajou asking for him to confirm the status of the Gowns. Elajou texted back stating he thought "Paul" in the UAE already sent them, however it turned out the Gowns had not been sent. Elajou told Constantinovici that the shipment was getting booked and he would provide her the information when he received it. Elajou also said the trucking of the LA portion of Gowns would get picked up for shipment and that Elajou would text Jakubowski himself when it happens. Constantinovici specifically then texted to Elajou and asked if Elajou could send the 25,000 Gowns in LA. Elajou responded that was his "plan." Elajou offered to call Jakubowski, but Constantinovici informed Elajou that would not help because Jakubowski simply wanted the delivery to arrive in Texas. Constantinovici asked if PJ Paige would be the driver and Elajou said he did not know. Based on communications from Elajou and Sanborn, Constantinovici promised that a portion of the Gowns would be delivered via driver to Texas on April 14 or April 15, 2020 (no Gowns would be received on April 14 or April 15, 2020).

53.     In truth, unknown at the time, late that night Elajou pulled up his internet browser and placed an order from an internet vendor for $5,590 worth of ValuBran Petite Isolation Gowns sourced from a clearance sale (*i.e.*, no longer sold on the market) from a wholesaler in Lancaster, New York. The isolation gowns were "**specially sized to fit petite adults or small children**[.]"

Ultimately, Elajou would send *some* of these children's gowns to the Distributor for use in nursing homes.

**Receipt Number: 110810**
**Order Date: Mon, Apr 13th 2020 10:36 pm**

Bill To...
WPCP
Juma Elajou
9350 Trade place
c
san diego, CA 92126
8588299303

Ship To...
WPCP
Juma Elajou
9350 Trade place
c
san diego, CA 92126
8588299303



| Product | | Price |
|---|---|---|
| ValuBran Petite Isolation Gowns w/ Thumb Restraints Product Code::cWS-0090 Item:WS0100P | | |
| Disposable Polypropylene Barrier Isolation Gowns are specially sized to fit petite adults or small children and protect against light fluid spray and particulates - available in blue color. Sold 50 per case. | 200 @ $27.95 = $5,590.00 | |
| *Limited Supplies. All sales final. No Exchanges. Returns or Credit* | | |
| *Additional shipping charges may apply* | | |

Payment Type...
Invoice Requested (Bill Me)
Shipping Method...
Shipping : 2020 Shipping Rates
Personalization...
**Please fill out the the following details**
**so that we can process your order.**
Purchase Order Number:
Department Contact:
Comments:

SubTotal : $5,590.00
Shipping : $0.00
Discounts : $0.00
Total : $5,590.00

54.    However, unknown at the time, bank records reveal that Elajou still had used **none** of the Purchase Funds to acquire any of the PPE Gowns.

55.    In the morning, on **Tuesday, April 14, 2020**, Constantinovici again texted Elajou and asked the status and whether PJ Paige was driving that today. At the same time,

Constantinovici texted Sanborn and asked her the same question. Elajou responded that he needed to find another driver and get confirmations. Constantinovici asked for details. Elajou responded: "[y]ou got it." He stated that he was waiting on the information. Elajou also texted, "[i]f you're happier with a refund say the word and I will do it." In light of the expressed reason of needing the Gowns for nursing home residents on an urgent basis, Constantinovici asked Elajou to "please send the tracking from LA." **At the same time, on that day, Elajou paid a portion of the Purchase Funds to his mother**.

56.    Like Elajou, Sanborn at first just responded to Constantinovici's inquiries with responsive texts about ventilators, ignoring her multiple questions about the Gowns. Frustrated, Constantinovici texted Sanborn that she needed information on the Gowns or a refund would be requested and that she needed this resolved before having any further conversations about anything else. Sanborn finally responded with little information requiring Constantinovici to again ask if at least the small portion of the order (25,000 from LA warehouse) was being sent. Sanborn only responded "maybe" but that she did not actually know. Sanborn sent Constantinovici a draft email from Sanborn and Elajou with what little information she had so that Constantinovici could transmit it to Jakubowski. The email included various logistical reasons for the delays. Elajou and Sanborn represented to Constantinovici that Roberts Trucking would be driving 7,500 Gowns to be delivered from San Diego to Fort Worth no later than Thursday morning and another 7,500 gowns were shipped today from Michigan via UPS Ground – as part of the extra 25,000 Gowns referenced by Sanborn for shipment in the morning to offset the delays, and the balance of the Gowns would be shipped from Turkey.

57.    Jakubowski then texted Constantinovici and asked if the driver left from the LA warehouse. Constantinovici responded to Jakubowski and expressed her similar frustration and

that she demanded of Elajou and Sanborn this be resolved in the next couple of hours or the order was headed for a refund. Constantinovici advised Jakubowski to expect an email on the status.

58.    Constantinovici texted Sanborn again a few hours later and asked for tracking numbers. Constantinovici also texted Elajou again. Elajou responded with photos of purported Gowns and said that 20,000 additional Gowns were on the way to Texas in addition to the "others" for delivery to the Distributor in Texas. Constantinovici asked Sanborn if they had even one piece of tangible detailed information to provide Jakubowski about the delivery Gowns. Sanborn said she would call with "tons of details" and, still frustrated, Constantinovici asked Sanborn to just send her something credible and concrete about the Gowns. Sanborn then texted that Roberts Trucking never showed and provided Constantinovici with a few abstract possibilities, prompting Constantinovici's response: "Ok, none of this is specific and concrete enough to send to [Jakubowski] [.]" Constantinovici stated she was going to send Jakubowski and email update after waiting for 5 hours on any concrete information, and again expressed her frustration to Sanborn about the failure to deliver Gowns allegedly ready for shipment since Friday in the LA warehouse and the failure to provide any tracking information. Sanborn just responded that she was trying to get Elajou on the phone and waiting to hear back from him. Constantinovici proceeded to send an update email based upon the little information she possessed at that time.

59.    As an interim stop-gap measure, Constantinovici conveyed to Jakubowski and Toler-Hoffman that 15,000 Gowns were being shipped from California and Michigan and offered an additional 25,000 Gowns (also located stateside) to compensate for the delay – all to be delivered to the Distributor in Fort Worth, Texas within 1-3 days ("***Interim Gowns***"). Constantinovici also conveyed Elajou's written excuse:

> "I want to apologize in advanced *[sic]* for this mess. I know everyone is stressed and concerned and it is all appropriate, but let me at least tell you where we are.

> **On Thursday/ Friday UAE time we sent out the wire to the bank of the distributer in the UAE. But it was flagged and put on hold because the receiving bank was considered 'suspicious'.**
>
> **Over the weekend we went through our own channels to secure our trust in the bank and pushed the wire through manually yesterday**.
>
> **The wire was received today- (again/ time frames are a bit confusing.) and the SGS is being scheduled.**
>
> **So what we have learned in this disrupted medical supply world during a pandemic is that the new rules of sending supplies through legitimate means has changed.**
>
> Where as before you would be given a slot on a flight prior the SGS inspection and then once the SGS inspection was done the Bill of lading was issued and the tracking number given as the items boarded the plane.
>
> Now there is no slot given on a plane until the SGS certification is completed and the slots and tracking number are given as the items that passed the certification process board the plane and are sent. Typically the day after the SGS.
>
> So what this means is that we are scheduling the SGS presently and it usually takes 3 days to get that done and the item leave the next day. **WE could ship item without SGS but we do not feel comfortable without having proof that the item we asked for are what we asked for!**"

(Bold and highlight emphases added). In other words, (1) Elajou breached the Escrow Requirement by allegedly wiring the Transferred Funds to his UAE supplier on April 13, 2020 **before** securing an SGS inspection and loading of the Gowns onboard a private charter plane, (2) Elajou blamed the delay on unsubstantiated "new rules of sending supplies[,]" and (3) Constantinovici communicated that the Gowns would be "*shipped from Turkey*[,]" even though, over a month earlier, Turkey had issued a March 4, 2020 order requiring companies to obtain government authorization to export or ship PPE ("***Turkish Decree***") (which Elajou/WPCP/WPCPI never pursued). Elajou's communication also demonstrates (though not known at the time) that he lied

at a minimum about "pushing a wire through manually" (which did not happen) and that a "wire was received" (which did not happen).

60.    At the same time and unknown to Plaintiff, **the order that Elajou secured from the State of Michigan for 50 ventilators was about to be exposed as a fraud**. Early that evening, the Chief Procurement Officer for the State of Michigan communicated to an accounts payable official:

> "[w]e may need to pull this wire first thing in the AM, if the money is still there. **Could be a scam**."

(emphasis added). The timing of Elajou's fraudulent scheme against the State of Michigan would prove to correspond with his similar scheme against KFG/PPE Fund, Plaintiff, and others that would unfold in the coming weeks and months.

61.    Later that evening Sanborn texted Constantinovici that Elajou sent her and the Distributor a letter with all the details. Constantinovici also finally was able to speak with Elajou, who continued to lie to Constantinovici about the status of the order of the PPE Gowns. Once again, unknown at the time, bank records reveal that Elajou had used **none** of the Purchase Funds to acquire any of the PPE Gowns. However, late in the night (1:35 a.m. the following day), Elajou used some of the Purchase Funds for the very first time to acquire purported PPE Gowns. Elajou purchased over $60,000 worth of "Disposable Lab Coats Medim [sic]" sourced from a **dental supply company** in Los Angeles, California, owned by Syrian dentist Houmam Affass.[9]

62.    In the early morning of **Wednesday, April 15, 2020**, the Chief Procurement Officer for the State of Michigan communicated to Elajou: "[d]o you have an update for me on the

---

[9] Upon delivery later in these events (described below), the nursing homes who would receive these "PPE Gowns" would open them to discover that they were simple dental lab coats – **not** compliant PPE Gowns (not exactly a surprise given that Elajou purchased them from a dental supply company).

ventilators?" Elajou ignored the email for over eight hours at which time he offered excuses about "madness in China." In the interim, the State of Michigan initiated a recall of its wire transfer to WPCP – but Elajou already had transferred the funds to other account(s) – including at least one personal account(s). Just as with Elajou's failure to use the Purchase Funds to acquire the PPE, Elajou had used none of the $2,661,268.75 from the State of Michigan to purchase any ventilators.

63.     Elajou, Katz, Constantinovici, and Toler-Hoffman exchanged emails regarding alleged "miscommunication" regarding shipments of Gowns, followed by a conference call from Elajou to one or more of the others. Constantinovici texted Elajou and asked for tracking information on the deliveries of Gowns from Michigan and San Diego. Elajou did not respond. However, Elajou forwarded Sanborn and Constantinovici an email with FedEx labels with tracking numbers for 20,000 Gowns. Jakubowski also requested an update, and the Distributor tried to call Constantinovici. Constantinovici responded with an update, and forwarded them the FedEx labels with tracking numbers for 20,000 Gowns and advised that Constantinovici would provide tracking for an additional 10,000 Gowns that would arrive on Friday (April 17, 2020). **At the same time, on that day, Elajou paid himself over $100,000 from the Purchase Funds, paid Elajou Investment Group $10,000 from the Purchase Funds, and paid an American Express Credit Card over $59,000.** However, unknown at the time, bank records reveal that Elajou still had used **<u>none</u>** of the Purchase Funds to acquire any of the PPE Gowns.

64.     The following day, on **Thursday, April 16, 2020**, Jakubowski asked Constantinovici: "Any word from Turkey?" Constantinovici texted the Group and asked Sanborn about the tracking on the other 10,000 Gowns. The Group also had a Zoom call on the various issues, including the Gowns. During the call, Elajou said that the 20,000 Gowns were sent out the prior day (April 15, 2020, for arrival by April 17, 2020), 10,000 sent out that day (April 16, 2020,

for arrival in 1-2 days), and 170,000 coming from Turkey (pending "approval"). Constantinovici emailed both Jakubowski and the Distributor (and copied Toler-Hoffman and Katz) this information:

> "170,000 gowns coming from Turkey - as described in the previous email, they are packed and awaiting the SGS process (please refer to detailed description of that process in my previous email). We will update you as soon as SGS has allowed the scheduling of transport upon inspection."

Later that day, Elajou texted the Group that the 10,000 Gowns were in stock for pick-up the next day. However, unknown at the time, bank records reveal that Elajou still had used **none** of the Purchase Funds to acquire any of the compliant PPE Gowns.

65.    The following day, on **Friday, April 17, 2020**, Jakubowski reiterated the extreme need for the Gowns: "Some of our [nursing homes] are treating 50+ covid patients and are down to less than a 3 day supply of gowns." Constantinovici again texted Sanborn and asked for the complete tracking information, including as to the 10,000 Gowns. Sanborn responded that Elajou was "really sick today and hard to reach" and Sanborn said she sent all the tracking numbers in the prior email with FedEx labels. Constantinovici, in turn, communicated the same to Jakubowski, Toler-Hoffman, Katz, and the Distributor. Constantinovici responded to Jakubowski:

> "Thanks [Jakubowski], we really appreciate the urgency and high priority need (honestly, I cried when I read that your facilities are running out of gowns in 3 days) – I've just called [Elajou/WPCP/WPCPI] again to see what we can ship asap from the supply available stateside. If you can provide us the addresses for the top 3 nursing homes in most need (the ones that are running out of gowns), we will work with whoever had the stock in their possession to ship directly to the three nursing homes in equal amounts (according to how they are packed as we will not be able to ask the supplier to repack according to specific numbers) - we will do the best we can to get approximate numbers distributed to nursing homes most in need."

Jakubowski replied with the names and addresses of the five nursing homes that were most in need and assisted in coordinating direct delivery.

66.    Four more days passed without the delivery of any Interim Gowns or Gowns. On

**Monday, April 20, 2020**, Jakubowski informed Constantinovici that only about 5,000 purported Gowns arrived. Jakubowski asked Constantinovici to coordinate a partial refund in light of the failures of full delivery. Constantinovici sent a message to the Group asking Elajou and Sanborn for an update on the Gowns and informed them that Jakubowski requested a partial refund if we could not promise and substantiate that the Gowns would be delivered by the next Monday.

67.    However, unknown at the time, bank records reveal that Elajou still had used **none** of the Purchase Funds to acquire any of the compliant PPE Gowns. Elajou at the same time feigned an offer to the State of Michigan to return the $2,661,268.75 to the State of Michigan if they would provide wire transfer information (a confidence scheme he would later use against KFG/PPE Fund).

68.    On **Tuesday, April 21, 2020**, in the very early morning, Jakubowski advised Constantinovici that "[i]t's getting very, very bad." Constantinovici continued to communicate with Elajou regarding destination of additional Gowns for delivery. The State of Michigan also advised Elajou that it already had recalled the wire the prior week and asked him if he would "confirm the money has left [his] account?" Elajou ignored the email. Hours later, a shipment of alleged Interim Gowns was delivered from Elajou/WPCP/WPCPI containing 21,000 units of purported PPE: 17,500 dental lab coats[10] and 3,500 child-sized gowns[11] ("***Delivered Noncompliant PPE***"). **None of the Delivered Noncompliant PPE received conformed with the Gowns made the subject of the PPE Purchase Agreements.** Jakubowski immediately notified Constantinovici of the Delivered Noncompliant PPE and advised:

"[t]his is causing massive, massive issues for us. We have made assurances that we

---

[10] "*Disposable Lab Coats Medim [sic]*" sourced from a **dental** supply company in Los Angeles, California, owned by Syrian dentist Houmam Affass.
[11] "*ValuBran Petite Isolation Gowns*" for children sourced from a clearance sale (*i.e.*, no longer sold on the market) from a wholesaler in Lancaster, New York.

are not keeping. People are relying on them. . . . People are literally dying because of this. One of our [nursing home] centers lost 43 patients this weekend, alone, and because of this situation they have relied on me for gowns."

Constantinovici again communicated with Elajou, Sanborn, Toler-Hoffman, and Katz via Group text regarding Jakubowski's complaints: "Guys, we need to get on a call and resolve this ASAP!! Please call us back[.]" Toler-Hoffman suggested a "group call to best figure out how to calmly but respectfully respond[.]" Sanborn suggested various abstract excuses designed to avoid fault. Constantinovici responded to Jakubowski's above communications and wrote that she had just received the following message from Elajou:

> "The [G]owns have been a mess. They were bought [April 18, 2020] on tarmac on way to you in turkey. Got returned. Got rebought!!!! All because of the mess in China. **We are happy to just send [Gernsbacher] back his money so he can spend it appropriately**."

(Bold emphasis added). Similarly, the State of Michigan, losing patience with Elajou's silence and refusal to account for the $2,661,268.75 he had taken from the State of Michigan without providing the 50 ventilators, communicated to Elajou:

> "We still do not have our money. We have recalled the wire and the bank has attempted to contact you and your bank with no success. By the end of the week, **I will be referring you to the state's attorney general's office and the FBI as I previously stated**. Don't think for a minute I am not serious about this.
>
> I'm sure you understand that the State of Michigan does not take this lightly."

(Emphasis added). Elajou responded with ironic and baseless accusations of misconduct:

> "It seems to me that if you recalled a wire last week that you were trying to get free equipment while behind the scenes taking the payment for them.
>
> Should any damages be incurred for this action you took: those amounts will be your responsibility.
>
> This isn't a practice that's on the up and up – **as a government you should be ashamed of yourself**."

(Emphasis added). With respect to the KFG/PPE Fund order, Constantinovici conveyed Elajou's

representation that the cause of the delay was made the subject of an international incident reported in the news,[12] involving the British government's purchase of 400,000 gowns from supplier(s) in Turkey – which clearly held no relation to any good faith execution or performance of the PPE Purchase Agreements. Constantinovici continued to seek a temporary fix for the failure of WPCP/WPCPI/Elajou and Sanborn to deliver the appropriate Gowns. She desperately sought gowns of any quality from a third-party vendor named Novik Group, LLC and communicated: "really anything is better then [sic] the **garbage bags** they are using now[.]" (emphasis added).

69.    Sanborn texted Constantinovici that she wanted Elajou to return the funds and she stated "I know he will." Sanborn also said "I will tell him to return the money and I think he can." She said "I will try my hardest . . . I just don't have the purse strings." She concluded "[Elajou] and I were only trying. Sorry."

70.    Later that day, Jakubowski informed Constantinovici that only approximately 20,000 Gowns arrived with respect to all of the FedEx labels (which were supposed to contain 30,000 Gowns as stated by Sanborn. Jakubowski also informed Constantinovici that the 3,500 to 5,000 Gowns were actually child-sized and non-compliant, which Constantinovici notified the Group via text. Constantinovici informed Sanborn and stated that a refund to KFG was needed as soon as possible in order to work with another supplier or return to Jakubowski. Sanborn responded to tell Jakubowski that "we will refund him immediately" and that they would do it that day (April 21, 2020). Sanborn said that Elajou was checking on reversal of an order from a supplier and, once cleared, it would be refunded to KFG. In the interim, Constantinovici reached out to other suppliers

---

[12] https://www.theguardian.com/society/2020/apr/20/raf-planes-await-order-to-set-off-to-collect-ppe-from-turkey

in an effort to fill the order for Gowns that Elajou and Sanborn were not able to fill, but all quotes were at least twice as much as the amount paid for the Gowns.

71.     On that same day, Jakubowski again requested a full refund of the Purchase Funds via "wire straight to [Gernsbacher][,]" but Constantinovici and Katz communicated that a wire refund directly to Gernsbacher "would not be possible[.]" Jakubowski responded, "[o]kay, so please conduct a reverse wire [transfer] to JFN. I'll handle it from there[.]"

72.     Shortly thereafter, Jakubowski participated in a Zoom video conference with Toler-Hoffman, Constantinovici, Katz, and Elajou, during which they all discussed and agreed as to the Delivered Noncompliant PPE, the termination of the requested delivery of the Gowns under the Purchase Order, and the agreement for an immediate refund of the total Purchase Funds. Consistent with the Supply Agreement Refund Terms and the termination of delivery of the Gowns, Elajou confirmed his agreement to refund the entirety of the Purchase Funds due to his own failure in performance ("***Refund Agreement***").

73.     Constantinovici thereafter advised "[w]e will make a refund and connect you directly to the [new] supplier if you like." Jakubowski responded, "[t]hat would be perfect." Toler-Hoffman asked Elajou and his representative, via their group text, "if you all can let me know ASAP when the wire has been sent as well as any confirmation of wire transfer to send to [Jakubowski] that would be great. Hoping if at all possible {Elajou} can do it as soon as he wakes up."

74.     In sum, Defendants promised to provide the Gowns manufactured by Entero in India, represented that the supplier was based in the UAE to whom Elajou wired the Transferred Funds in violation of the Escrow Requirement, and then claimed the Gowns were both bought and lost on a tarmac during an international incident with the British government in Turkey (which a

month earlier had banned the export of PPE without prior government approval). In light of Defendants' collective failure to perform, Jakubowski accepted Elajou's proposal and requested the return of the Purchase Funds.

75.     The next morning, on **Wednesday, April 22, 2020**, the State of Michigan informed Elajou that he should contact his bank with the recall reference number to facilitate the return of the $2,661,268.75 to the State of Michigan. Toler-Hoffman also followed up on the Zoom call and texted the Group asking Elajou and Sanborn to coordinate the wire transfer of the refunded Purchase Funds as agreed.

76.     At the same time, Constantinovici frantically had been attempting to reach Elajou since the Zoom video conference two days earlier: "I am saddened that you have not responded to my calls or texts since the call as I attempted to check in with both of you after the call." Sanborn responded that she had been "[t]rying to regroup and help [Elajou] and I figure out how we want to move forward" and remarked that Jakubowski was "a bit of a brat and not really the kind of person I want to interact with if I have a choice." Constantinovici shared these and related communications with Katz and Toler-Hoffman, and advised them:

> "Regarding the gowns sent to Kahal last week, they have apparently started arriving at the nursing homes today, and they are not Level 2 gowns as ordered. In order to help you in your dealings with the vendor who sent them, I'm providing as much detailed information as I was able to gather regarding what was sent, including product picture.
>
> "The gowns received by the nursing homes are lab coats with buttons in the front that don't snap in easily to fasten the gowns and are open in the front rather than back, as isolation gowns that are needed for COVID-19 protection are intended to be (open in the back with ties). In short, **the product sent is not what was requested or ordered** - on top of this, the majority of the stock sent was size small (this is separate from the 3,500 that were child size) and therefore less useful in protecting those who are in need and do not fit a size small, in addition to now being the type of gown ordered.

"**None of the gowns sent were what was ordered** (picture of gowns received enclosed) and Alex is now receiving emails and calls about unusable product being sent, including continued threats of lawsuits, as he just called me to let me know. Enclosing the screenshot of one email received today from a nursing home director indicating they received product that did not match what was ordered.

Please let me know if there is anything else I can do to help you recover payment on these gowns or rather lab coats (that apparently are designed to be used by dentists)."

(Emphasis added). On the same day, Elajou emailed the State of Michigan and attempted to side-step the requested refund of the $2,661,268.75 to the State of Michigan:

"your order may already be in process and to be sent out. I am asking for an up to date confirmation and will report back. If this order is already in process and we cannot stop it as there are penalties that are not refundable."

Elajou was well aware that he spent none of the $2,661,268.75 on ventilators and no order was "already in process." The Chief Procurement Officer responded: "I think it would be best if you return our money and follow the instructions." Elajou replied:

"Please refer to my last email. **I am doing more than anyone else would care to**. When I know more: you will know more."

(Emphasis added).

77.    The following day, on **Thursday, April 23, 2020**, the Chief Procurement Officer for the State of Michigan communicated to Elajou: OK, so just confirming that you don't intend to return our money as requested." Elajou did not respond.

78.    With respect to his agreement to refund the Purchase Funds to KFG/PPE Fund, Elajou scrambled in an effort to keep some or all of the money he had defrauded from the State of Michigan and KFG/PPE Fund and Plaintiff, so he reneged and said he would return only *some* of the Purchase Funds and purportedly made an effort to wire transfer to KFG a *partial* refund in the amount of $694,248.25 ("***Unused Funds***") (based upon a value and alleged credit unilaterally assigned by WPCP/WPCPI/Elajou to the Delivered Noncompliant PPE by Defendants – a

violation of the PPE Purchase Agreements, the Supply Agreement Refund Terms, and the Refund Agreement). The wire transfer appeared to be received by KFG on that day, and Toler-Hoffman and KFG (and the PPE Fund) took steps to wire transfer it to JFN/Gernsbacher. In response, Jakubowski communicated to Toler-Hoffman his frustration:

> "I hear now our UAE 'friends' aren't refunding our full amount? Even though they still haven't sent us a single functional gown . . . [t]hese are bad actors who are screwing you while they look you dead in the eye. It's truly, truly despicable[.]"

Toler-Hoffman responded: "Completely frustrating and disheartening." Jakubowski likewise communicated to _both_ Toler-Hoffman and Constantinovici:

> "not one single product as ordered has come to our warehouse. Furthermore, only 21,000 products were received at all. 3500 were child-sized gowns, and 17,500 were lab coats with button up fronts. The fact that they believe they have ANY right to withold funds from you right now is a travesty beyond measure."

79.    That afternoon, a **Special Agent with the Michigan Department of Attorney General (Financial Crimes Division)** communicated to Elajou:

> "This is Special Agent Supervisor Steve Morse with the Michigan Department of Attorney General's Financial Crimes Division. I am investigating the matter in which **we have requested a refund of $2,661,268.75 for products you have failed to deliver as promised**.
>
> I understand that you have retained an attorney to advise you how to proceed. You may have your attorney contact me by email or at the phone number below. **I will continue with the criminal investigation** unless satisfactory arrangements are made for a full refund to the State of Michigan."

(Emphases added). Elajou responded: "I will make arrangements to send back the funds. Furthermore, I preserve _[sic]_ all my rights under the law." It would be days or weeks before Elajou would return the $2,661,268.75 (that he possessed all along) to the State of Michigan after being subjected to a criminal investigation and potential referral to the FBI. WPCP/Elajou disclosed none

of this information to KFG/PPE Fund, Plaintiff, or any other party to this proceeding (included in discovery responses).[13]

80.    On **Friday, April 24, 2020**, KFG attempted to transfer the Unused Funds in the amount of $694,248.25 to JFN. However, later that same day, Toler-Hoffman informed Jakubowski that WPCP/WPCPI/Elajou's wire transfer of the Unused Funds to KFG in the amount of $694,248.25 had been "recalled from our account" and that KFG never actually received a refund from WPCP/WPCPI/Elajou, thereby preventing KFG from delivering the total amount of the Unused Funds to JFN/Gernsbacher. In response to the obvious inquiries, Elajou purported to be dumbfounded as to why his efforts at a wire transfer of the Unused Funds had failed. Elajou texted the following screenshot:



---

[13] Plaintiff assumes that the attorney that Elajou retained in Michigan is his same Michigan counsel that has appeared in this proceeding.

Elajou provided no further material explanation as to why the wire transfer failed and what he had done with the Stolen Funds. However, Gernsbacher later learned that Elajou/WPCP/WPCPI's bank account (with JP Morgan Chase Bank, N.A. ["**_Bank_**"]) had been emptied of almost $1 million **the day before** Elajou/WPCP/WPCPI requested a wire transfer of the Unused Funds to KFG in the amount of $694,248.25, which resulted in the Bank recalling the wire transfer on April 24, 2020. Elajou never made another "attempt" to comply with his obligations to return any of the Purchase Funds.

81.     On **Wednesday, April 29, 2020**, in response to concerns regarding Elajou's failure to return the Stolen Funds, Elajou communicated to Toler-Hoffman: "the misconception or fear of not receiving either the products or money back is Ludacris [*sic*]!"[14] Elajou explained:

> "**[w]e follow a strict company** policy for each order a customer places. This policy has not changed and will not for anyone, it is quite simple.. Each and every order will either:
>
> A) Be fulfilled to its fullest as promised
>
> B) Refund the money to the customer if we cannot fulfill it."

(Emphasis added). On the same day, Jakubowski texted Constantinovici and urgently requested a call to discuss the status. Constantinovici sought direction from Toler-Hoffman, who informed her to proceed with the call but to "just listen" (*i.e.*, not say anything of substance). Toler-Hoffman instructed Constantinovici to thereafter call Toler-Hoffman for an update. Nonetheless, despite substantial efforts, the Stolen Funds have not been returned or made the subject of any accounting by any of Defendants.

82.     Unknown at the time, on **Wednesday, May 6, 2020**, bank records reveal that Elajou

---

[14] The word "ludicrous" means foolish, unreasonable, or ridiculous. "Ludacris" a/k/a Luda is a well-known rapper and actor.

emptied all of his accounts of over $1 million dollars (including all of the remaining Purchase Funds). To date, Elajou has refused to account for those Purchase Funds.

83.     In **May and June 2020**, Gernsbacher engaged in direct communications with Elajou in continued pursuit of the refund of the Purchase Funds and still believed Elajou's promise that he would be "happy to just send [Gernsbacher] back his money so he can spend it appropriately." Gernsbacher wrote:

> "Juma, my name is Harold Gernsbacher. I received a copy of your letter from [Toler-Hoffman], I have made numerous attempts to call you so that we can work through the misunderstanding and the missing money that was sent to [Toler-Hoffman's] foundation. Please call me at [*redacted cell number*]. Thanks."

Of the course of the next two months, Elajou played a continuing confidence game and scheme of delay:

- "Sorry for the delay in getting back to you. The days have become quite hectic during these times."

- "Just wanted to let you know I didn't forget our call: I will call you in the morning."

- "I've been dealing with some other mess. May we speak in the morning please instead?"

- "Sorry I haven't called back . . . [i]t's my birthday today and my wife has something planned. I'll give you a call tomorrow morning."

Elajou even sent Gernsbacher some unsolicited coffee beans (rather than return the Stolen Funds).

84.     On **Friday, June 19, 2020**, over two months after the Gowns were to be delivered, over a month after the Purchase Order was canceled and Elajou promised to return the Purchase Funds, and after weeks of Gernsbacher's demands and Elajou's repeated promises to return the Stolen Funds, Elajou generated a new self-serving "solution" and texted Gernsbacher:

> "Good morning, Harold! Yes finally. Your gowns are on the way and will start arriving this coming week :)"

Aside from the fact that Elajou already had promised on numerous occasions to return the Stolen

Funds, by that date the need for Gowns had either passed or been addressed by legitimate vendors and the market for PPE was far more buyer friendly. Gernsbacher responded moments later:

> "No Juma they will not. I do not want them. Sell them elsewhere and return my money. We have left PPE you are months late. The gowns at the time were priced in market. Today they are way out of market. Please simply return my money, Thanks Harold."

Over the next two weeks, Elajou again promised to return the Stolen Funds, but also continued to offer excuse after excuse while ignoring any substantive discussion with Gernsbacher:

- "I have not forgotten about you. I apologize for the delay. I will make sure we speak today to resolve this together in the best possible way."

- "Hi Harold. May I please get all of the company details to whom the money will be paid to?"

- "Hey Harold! I'm sorry for the late reply. I got a little overtaken by a few things. May I circle back with you tomorrow please?"

For several days, Elajou continued to ignore Gernsbacher while secretly retaining legal counsel.

On July 3, 2020, Elajou sent the following email to his current legal counsel and copied Gernsbacher:

> "Good morning Nick, I hope this email finds you well. I received this message from Harold Gernsbacher. Harold is cc'd on this e-mail. This is regarding the same transaction we spoke of the other day. We had not been able to reconnect yet at the time he sent this message to discuss further details. Regardless, now it seems his group wants to pursue legal action and I believe turning this over to you is what's appropriate at this point."

The message Elajou references in the above email was a screenshot showing numerous text communications from Gernsbacher to which Elajou never responded. At that point, the parties' respective attorneys engaged in months of discussions which (despite Gernsbacher's requests) included no complete accounting or explanation of what Elajou had done with the Stolen Funds.

85.    No refund occurred despite repeated acknowledgement by Elajou of the refund obligation under the PPE Purchase Agreements, Supply Agreement Refund Terms, Refund

41

Agreement, and non-conformance of the Delivered Noncompliant PPE, as well as multiple representations from Elajou/WPCP/WPCPI confirming repayment would be made. Instead, Elajou engaged counsel to dispute the payment obligation and, in a move that certainly will shock the conscience of the jurors at trial, fled the United States to United Arab Emirates while he simultaneously filed counterclaims, cross-claims, and third-party claims against his victims. Moreover, on November 10, 2020, Elajou/WPCP responded to written discovery wherein the summary of his latest excuse was that "shipment from China was delayed" . . . even though China has nothing to do with the subject transaction. Plaintiff required and Defendants represented that the Gowns were sourced from the UAE or India – not China. During a deposition of Elajou in this proceeding, he denied knowing anything about WPCPI, anyone named "Paul" in relation to the transactions underlying the PPE Purchase Agreements, or any knowledge of Sanborn's involvement – even though all of his documented participation in the transaction definitively proves otherwise. All of these actions bear the hallmarks of a classic case of fraud. During the same deposition, Elajou admitted that he used none of the Purchase Funds for acquisition of the PPE Gowns and claimed that his mother-in-law in the UAE provided him an undocumented "loan" of over $2 million to act "in the place" of the Purchase Funds that he was contractually obligated as a fiduciary to maintain in an escrow account for use only to acquire the PPE Gowns. To date, Defendants have refused to provide Gernsbacher with any complete documents, communications or other information in support of the transaction.

86.     In summary, Gernsbacher, JFN, KAHAL, Jakubowski, KFG, and Constantinovici were induced to participate in and/or fund the transactions forming the PPE Purchase Agreements based upon the material misrepresentations and omissions of Defendants as set forth above herein. Moreover, Defendants wholly failed to maintain the Purchase Funds pursuant to the Escrow

Requirement, failed to deliver the Gowns as promised, and, as of the date of this pleading, failed to perform express agreements to return the Stolen Funds wrongly acquired under the PPE Purchase Agreements. As a result of all of the foregoing misconduct, Gernsbacher (individually and as assignee of JFN, KAHAL, Jakubowski, KFG, and Constantinovici) brings the following causes of action against Defendants.

**V.**

**Causes of Action**

**A.**   ***Breach of Purchase Order, Invoice, Confirmation Letter, Supply Agreement Refund Terms, and Refund Agreement.***

87.   The foregoing allegations are incorporated herein by reference.

88.   Gernsbacher, individually and as assignee of JFN, KAHAL, Jakubowski, KFG, PPE Fund, and Constantinovici, is a party and/or third-party beneficiary of the Purchase Order, Invoice, Confirmation Letter, Supply Agreement Refund Terms, and Refund Agreement.

89.   Through Defendants' individual acts and omissions, partnership and agency, and Elajou/WPCP/WPCPI's direct contractual participation and involvement, Defendants failed to comply with the PPE Purchase Agreements by failing to perform their obligations therein, including as to use of the Purchase Funds, the Escrow Requirement, the delivery of the Gowns (rather than the Delivered Noncompliant PPE), and return of the Stolen Funds, each of which amounts to material breaches of the Purchase Order, Invoice, Confirmation Letter, Supply Agreement Refund Terms, and Refund Agreement.

90.   Elajou is vicariously liable for these breaches.   Elajou is the sole managing member, operator and agent of WPCP, and partner and agent for WPCPI.  Elajou used both WPCP and WPCPI in a manner not consistent with separate identities respecting the corporate forms, mixed funds, and expended funds for his own use. Elajou used WPCP and WPCPI to solicit the

Purchase Order and payment of Purchase Funds with promises of holding those amounts in escrow until the PPE Gowns were secured and promises to return the Purchase Funds if the PPE Gowns could not be secured, but used the Purchase Funds for his and his family's immediate benefit. As such,

    a.    Elajou used WPCP and WPCPI as a sham to perpetrate a fraud;

    b.    Both WPCP and WPCPI were organized and operated as a mere tool or business conduit of Elajou (alter ego);

    c.    Both WPCP and WPCPI were used to evade an existing legal obligation;

    d.    Both WPCP and WPCPI were used to protect against the discovery of Elajou's crime of theft;

    e.    Both WPCP and WPCPI are inadequately capitalized with the effect of creating an injustice as both entities had zero (and negative) balances before receipt of the Purchase Funds;

    f.    Elajou also used both WPCP and WPCPI for the purpose of perpetrating an actual fraud by Elajou and did perpetrate an actual fraud on Gernsbacher (individually and as assignee) primarily for Elajou's direct personal financial benefit.

Elajou should not only be held personally liable for his individual actions but also for his agency and representative actions on behalf of WPCP and WPCPI because Elajou had knowledge of and benefitted from his fraudulent acts and omissions as an agent for WPCP and WPCPI as described herein and for the acts and omissions of WPCP and WPCPI themselves.

    91.    Based on the foregoing, Gernsbacher has been damaged in an amount within the jurisdictional limits of the Court, including without limitation the Stolen Funds, and is, therefore, entitled to recovery of those damages. Gernsbacher requests the recovery of actual damages, attorneys' fees, costs, and expenses.

**B.**     ***Violation of Theft Liability Act (Tex. Civ. Prac. & Rem. Code, Ch. 143; Penal Code, Chs. 31-33).***

    92.    The foregoing allegations are incorporated herein by reference.

93.     Gernsbacher, individually and as assignee of JFN, KAHAL, Jakubowski, KFG, PPE Fund, and Constantinovici, asserts a cause of action under the Texas Theft Liability Act as set forth in Chapter 134 of the TEXAS CIVIL PRACTICE AND REMEDIES CODE. Defendants (through their individual acts and omissions, partnership and agency, and Elajou/WPCP/WPCPI's direct contractual participation and involvement) committed theft by unlawfully appropriating the above-referenced Stolen Funds. The demands of Gernsbacher (including by his assignors) for the return of above-referenced Stolen Funds have been refused.

94.     <u>Elajou is vicariously liable for this violation.</u>  Elajou is the sole managing member, operator and agent of WPCP, and partner and agent for WPCPI.  Elajou used both WPCP and WPCPI in a manner not consistent with separate identities respecting the corporate forms, mixed funds, and expended funds for his own use. Elajou used WPCP and WPCPI to solicit the Purchase Order and payment of Purchase Funds with promises of holding those amounts in escrow until the PPE Gowns were secured and promises to return the Purchase Funds if the PPE Gowns could not be secured, but used the Purchase Funds for his and his family's immediate benefit. As such,

a.      Elajou used WPCP and WPCPI as a sham to perpetrate a fraud;

b.      Both WPCP and WPCPI were organized and operated as a mere tool or business conduit of Elajou (alter ego);

c.      Both WPCP and WPCPI were used to evade an existing legal obligation;

d.      Both WPCP and WPCPI were used to protect against the discovery of Elajou's crime of theft;

e.      Both WPCP and WPCPI are inadequately capitalized with the effect of creating an injustice as both entities had zero (and negative) balances before receipt of the Purchase Funds;

f.      Elajou also used both WPCP and WPCPI for the purpose of perpetrating an actual fraud by Elajou and did perpetrate an actual fraud on Gernsbacher (individually and as assignee) primarily for Elajou's direct personal financial benefit.

Elajou should not only be held personally liable for his individual actions but also for his agency and representative actions on behalf of WPCP and WPCPI because Elajou had knowledge of and benefitted from his fraudulent acts and omissions as an agent for WPCP and WPCPI as described herein and for the acts and omissions of WPCP and WPCPI themselves.

95.    Based on the foregoing, Gernsbacher has been damaged in an amount within the jurisdictional limits of the Court, including without limitation the Stolen Funds, and is, therefore, entitled to recovery of those damages. Gernsbacher requests the recovery of actual, consequential, and exemplary damages, in addition to statutory damages of up to $1,000.00 per occurrence, attorneys' fees, costs, and expenses.

**C.    *Conversion.***

96.    The foregoing allegations are incorporated herein by reference.

97.    Gernsbacher, individually and as assignee of JFN, KAHAL, Jakubowski, KFG, PPE Fund, and Constantinovici, asserts a cause of action of conversion. Gernsbacher is the rightful owner of the above-referenced Stolen Funds converted by Defendants (through their individual acts, partnership and agency, and Elajou/WPCP/WPCPI's direct participation and involvement) for their own financial and self-promotional benefit. Defendants unlawfully and without authorization assumed and exercised control over the Stolen Funds inconsistent with Gernsbacher's rights as the owner of the Stolen Funds. The demands of Gernsbacher (including by his assignors) for the return of the Stolen Funds have been refused.

98.    <u>Elajou is vicariously liable for conversion</u>.    Elajou is the sole managing member, operator and agent of WPCP, and partner and agent for WPCPI.  Elajou used both WPCP and WPCPI in a manner not consistent with separate identities respecting the corporate forms, mixed funds, and expended funds for his own use. Elajou used WPCP and WPCPI to solicit the Purchase

Order and payment of Purchase Funds with promises of holding those amounts in escrow until the

PPE Gowns were secured and promises to return the Purchase Funds if the PPE Gowns could not

be secured, but used the Purchase Funds for his and his family's immediate benefit. As such,

    a.    Elajou used WPCP and WPCPI as a sham to perpetrate a fraud;

    b.    Both WPCP and WPCPI were organized and operated as a mere tool or business conduit of Elajou (alter ego);

    c.    Both WPCP and WPCPI were used to evade an existing legal obligation;

    d.    Both WPCP and WPCPI were used to protect against the discovery of Elajou's crime of theft;

    e.    Both WPCP and WPCPI are inadequately capitalized with the effect of creating an injustice as both entities had zero (and negative) balances before receipt of the Purchase Funds;

    f.    Elajou also used both WPCP and WPCPI for the purpose of perpetrating an actual fraud by Elajou and did perpetrate an actual fraud on Gernsbacher (individually and as assignee) primarily for Elajou's direct personal financial benefit.

Elajou should not only be held personally liable for his individual actions but also for his

agency and representative actions on behalf of WPCP and WPCPI because Elajou had knowledge

of and benefitted from his fraudulent acts and omissions as an agent for WPCP and WPCPI as

described herein and for the acts and omissions of WPCP and WPCPI themselves.

    99.    Based on the foregoing, Gernsbacher has been damaged in an amount within the

jurisdictional limits of the Court, including without limitation the Stolen Funds, and is, therefore,

entitled to recovery of those damages. Gernsbacher requests the recovery of actual, consequential,

and exemplary damages.

**D.**    ***Fraudulent Misrepresentation, Inducement, and Nondisclosure.***

    100.    The foregoing allegations are incorporated herein by reference.

    101.    Gernsbacher, individually and as assignee of JFN, KAHAL, Jakubowski, KFG,

PPE Fund, and Constantinovici, asserts causes of action for Fraudulent Misrepresentation, Inducement, and Nondisclosure. Defendants (through their individual acts and omissions, partnership and agency, and Elajou/WPCP/WPCPI's direct contractual participation and involvement) made material representations to Gernsbacher (and his assignors), knew the representations were false or made them recklessly as positive assertions without any knowledge of their truth, each intended to induce each of Gernsbacher (and his assignors) to act upon the representations, and each of Gernsbacher (and his assignors) actually and justifiably relied on the representations, which caused injury to Gernsbacher.

102. Defendants concealed or failed to disclose facts that they had a duty to disclose that were material and were not otherwise known by Gernsbacher (and his assignors). By failing to disclose facts, each of Defendants intended to induce Gernsbacher (and his assignors) to take no action on those concealed facts the absence of which they relied upon, which caused injury to Gernsbacher.

103. Specific examples of fraudulent misrepresentation, inducement and nondisclosure are provided in detail herein above in **paragraphs 17 through 85**. These misrepresentations are summarized as follows:

104. From the time that Elajou and his representatives began their efforts to solicit business from Plaintiff (and his assignors), Defendant Elajou, individually and as alter ego and agent of WPCP and WPCPI, made multiple, blatant and material misrepresentations to Plaintiff, through his agents and representatives, regarding services and abilities related to supplying PPE, all of which were materially relied upon by Plaintiff (and his assignors) as inducements to enter into the PPE Transaction with, and wire transfer the Purchase Funds to, Defendants Elajou, WPCP and WPCPI. These misrepresentations, virtually all of which are documented in written

communications, are set out in specific detail in the foregoing **paragraphs 17 through 40**, which cover the dates April 1 through April 8, 2020 leading up to Plaintiff (and his assignors) transferring the Purchase Funds to Elajou/WPCP/WPCPI (*e.g*., that Elajou had 200,000 gowns for immediate delivery, 10k-20k gowns in LA warehouse for immediate delivery and the balance from UAE in 7 days, gowns would be transported by private charter plane with a large ventilator order, the obligations in transaction documents he prepared, including the terms and escrow obligation).

105.    Additional misrepresentations (and omissions) occurred between April 8 and April 21, 2020, which are detailed herein above in **paragraphs 34 through 74**. These misrepresentations involve extensive and ongoing misrepresentations and ommissions intended to mislead Plaintiff (and his assignors) into believing that Elajou had, or was in the process of, purchasing and delivering PPE with the Purchase Funds, including misrepresentations regarding the status of gown orders, the location of gown product to fill the orders, the status of acquisition, tracking and delivery of the gowns by plane or driver (including pictures of pilot and crew), puffery regarding aggregating large ventilator orders ($24 million) and donating $50,000 in supplies, followed by multiple false representations regarding fantastic shipping difficulties that were causing delays, including a wild story that gowns were bought and lost on a tarmac in Turkey.  Also during this time frame and set out in the same paragraphs, Elajou also failed to disclose material facts that he had violated his escrow agreement, that he not used the Purchase Funds to purchase any Gowns, and that he had, instead immediately stolen and transferred the Purchase Funds to multiple personal accounts and family members.  He further failed to disclose to Plaintiff (and his assignors) that he had only ordered $5590 worth of noncompliant petite gowns and dental lab coats.

106.    Additional misrepresentations occurred between April 21 and May 6, 2020, detailed above herein in **paragraphs 75 through 82**, in which Elajou represented and agreed that

he would provide a refund, and then attempted a fraudulent wire transfer of $694,248.25 and sent a text message screenshot showing he had attempted the wire transfer. Elajou failed to disclose that his bank account had been emptied of almost $1m the day prior. Elajou failed to disclose that he had experienced a failed transaction with the State of Michigan that had caused a reversal of credit of $2.6m in his WPCP account. Elajou proceeded to double-down and further misrepresent that he would abide by his agreement to refund the money. Elajou failed to disclose that, soon thereafter, on May 6, 2020, he emptied all of the WPCP accounts of over $1m, including all of the remaining Purchase Funds.

107.    Additional misrepresentations occurred between the dates of May 7, 2020 through July 3, 2020, detailed in **paragraphs 83 through 84** above. During that time-frame, Elajou communicated directly with Gernsbacher by telephone, making further misrepresentations of his intent to repay funds and his ability to fill the original order in an attempt to avoid Plaintiff (and his assignors) pursuing legal action.

108.    <u>Elajou is individually and vicariously liable for these acts of fraud.</u>   Elajou, as the sole managing member, operator and agent of WPCP, and as a partner and agent for WPCPI, is individually liable for his own acts of fraud. Additionally, Elajou used both WPCP and WPCPI in a manner not consistent with separate identities respecting the corporate forms, mixed funds, and expended funds for his own use. Elajou used WPCP and WPCPI to solicit the Purchase Order and payment of Purchase Funds with promises of holding those amounts in escrow until the PPE Gowns were secured and promises to return the Purchase Funds if the PPE Gowns could not be secured, but used the Purchase Funds for his and his family's immediate benefit. As such,

a.    Elajou used WPCP and WPCPI as a sham to perpetrate a fraud;

b.    Both WPCP and WPCPI were organized and operated as a mere tool or business conduit of Elajou (alter ego);

    c.       Both WPCP and WPCPI were used to evade an existing legal obligation;

    d.       Both WPCP and WPCPI were used to protect against the discovery of Elajou's crime of theft;

    e.       Both WPCP and WPCPI are inadequately capitalized with the effect of creating an injustice as both entities had zero (and negative) balances before receipt of the Purchase Funds;

    f.       Elajou also used both WPCP and WPCPI for the purpose of perpetrating an actual fraud by Elajou and did perpetrate an actual fraud on Gernsbacher (individually and as assignee) primarily for Elajou's direct personal financial benefit.

Elajou should not only be held personally liable for his individual actions but also for his agency and representative actions on behalf of WPCP and WPCPI because Elajou had knowledge of and benefitted from his fraudulent acts and omissions as an agent for WPCP and WPCPI as described herein and for the acts and omissions of WPCP and WPCPI themselves.

109.    These actions by Defendants have caused Gernsbacher damage in an amount within the jurisdictional limits of this Court, including without limitation the Stolen Funds, but in an amount yet to be fully determined. Moreover, because Defendants' actions were done knowingly, willfully, maliciously, fraudulently, and with gross negligence, Gernsbacher seeks to recover exemplary or punitive damages.

**E.    *Negligence.***

110.    The foregoing allegations are incorporated herein by reference.

111.    Gernsbacher, individually and as assignee of JFN, KAHAL, Jakubowski, KFG, PPE Fund, and Constantinovici, asserts the alternative cause of action of negligence to the extent their intentional actions were not accompanied entirely by wrongful intent. Defendants (through their individual acts and omissions, partnership and agency, and Elajou/WPCP/WPCPI's direct contractual participation and involvement) owed a legal duty of care to Gernsbacher (and his

assignors) in the performance of their agreements to supply the Gowns to KAHAL under the PPE Purchase Agreements and in the handling and use of the Purchase Funds for that sole purpose.

112.    Defendants failed to exercise the proper standard of care in the performance of their duties and obligations arising under their agreements to supply the Gowns to KAHAL under the PPE Purchase Agreements.

113.    Defendants' breach of the standard of care proximately caused injury to Gernsbacher (and his assignors).

114.    <u>Elajou is vicariously liable for negligence.</u>    Elajou is the sole managing member, operator and agent of WPCP, and partner and agent for WPCPI.  Elajou used both WPCP and WPCPI in a manner not consistent with separate identities respecting the corporate forms, mixed funds, and expended funds for his own use. Elajou used WPCP and WPCPI to solicit the Purchase Order and payment of Purchase Funds with promises of holding those amounts in escrow until the PPE Gowns were secured and promises to return the Purchase Funds if the PPE Gowns could not be secured, but used the Purchase Funds for his and his family's immediate benefit. As such,

    a.    Elajou used WPCP and WPCPI as a sham to perpetrate a fraud;

    b.    Both WPCP and WPCPI were organized and operated as a mere tool or business conduit of Elajou (alter ego);

    c.    Both WPCP and WPCPI were used to evade an existing legal obligation;

    d.    Both WPCP and WPCPI were used to protect against the discovery of Elajou's crime of theft;

    e.    Both WPCP and WPCPI are inadequately capitalized with the effect of creating an injustice as both entities had zero (and negative) balances before receipt of the Purchase Funds;

    f.    Elajou also used both WPCP and WPCPI for the purpose of perpetrating an actual fraud by Elajou and did perpetrate an actual fraud on Gernsbacher (individually and as assignee) primarily for Elajou's direct personal financial benefit.

Elajou should not only be held personally liable for his individual actions but also for his agency and representative actions on behalf of WPCP and WPCPI because Elajou had knowledge of and benefitted from his fraudulent acts and omissions as an agent for WPCP and WPCPI as described herein and for the acts and omissions of WPCP and WPCPI themselves.

115.    Based on the foregoing, Gernsbacher has been damaged in an amount within the jurisdictional limits of the Court, including without limitation the Stolen Funds, and is, therefore, entitled to recovery of those damages. Gernsbacher requests recovery of actual damages.

**F.    *Negligent Misrepresentation.***

116.    The foregoing allegations are incorporated herein by reference.

117.    Gernsbacher, individually and as assignee of JFN, KAHAL, Jakubowski, KFG, PPE Fund, and Constantinovici, asserts the alternative cause of action of negligent misrepresentation to the extent their intentional actions were not accompanied entirely by wrongful intent. Defendants (through their individual acts and omissions, partnership and agency, and Elajou/WPCP/WPCPI's direct contractual participation and involvement) made representations to Gernsbacher (and his assignors) during the course of the transactions forming the basis of the PPE Purchase Agreements. In making those representations, Defendants supplied false information for the guidance of Gernsbacher (and his assignors). Defendants did not use ordinary care in obtaining or communicating that information. Gernsbacher (and his assignors) justifiably relied upon the representations made by Defendants. These negligent misrepresentations of Defendants proximately caused injury to Gernsbacher (and his assignors).  The misrepresentations relied upon for this cause of action are set forth in detail above in **paragraphs 17 through 84**, and are also summarized in **Section V.D** above.

118.    Elajou is vicariously liable for negligent misrepresentation.    Elajou is the sole

managing member, operator and agent of WPCP, and partner and agent for WPCPI. Elajou used

both WPCP and WPCPI in a manner not consistent with separate identities respecting the corporate

forms, mixed funds, and expended funds for his own use. Elajou used WPCP and WPCPI to solicit

the Purchase Order and payment of Purchase Funds with promises of holding those amounts in

escrow until the PPE Gowns were secured and promises to return the Purchase Funds if the PPE

Gowns could not be secured, but used the Purchase Funds for his and his family's immediate

benefit. As such,

     a.     Elajou used WPCP and WPCPI as a sham to perpetrate a fraud;

     b.     Both WPCP and WPCPI were organized and operated as a mere tool or business conduit of Elajou (alter ego);

     c.     Both WPCP and WPCPI were used to evade an existing legal obligation;

     d.     Both WPCP and WPCPI were used to protect against the discovery of Elajou's crime of theft;

     e.     Both WPCP and WPCPI are inadequately capitalized with the effect of creating an injustice as both entities had zero (and negative) balances before receipt of the Purchase Funds;

     f.     Elajou also used both WPCP and WPCPI for the purpose of perpetrating an actual fraud by Elajou and did perpetrate an actual fraud on Gernsbacher (individually and as assignee) primarily for Elajou's direct personal financial benefit.

Elajou should not only be held personally liable for his individual actions but also for his agency

and representative actions on behalf of WPCP and WPCPI because Elajou had knowledge of and

benefitted from his fraudulent acts and omissions as an agent for WPCP and WPCPI as described

herein and for the acts and omissions of WPCP and WPCPI themselves.

     119.    Based on the foregoing, Gernsbacher has been damaged in an amount within the

jurisdictional limits of the Court, including without limitation the Stolen Funds, and is, therefore,

entitled to recovery of those damages. Gernsbacher requests recovery of actual damages.

### G.    *Money Had and Received and Unjust Enrichment.*

120.    The foregoing allegations are incorporated herein by reference.

121.    Gernsbacher, individually and as assignee of JFN, KAHAL, Jakubowski, KFG, PPE Fund, and Constantinovici, asserts a cause of action against Defendants (through their individual acts and omissions, partnership and agency, and Elajou/WPCP/WPCPI's direct contractual participation and involvement) for money had and received. Gernsbacher (and his assignors) are the rightful owners of the above-referenced Stolen Funds converted by Defendants for their benefit. The Stolen Funds can be directly traced to the transfer to bank accounts held by Defendants. Accordingly, Defendants hold/held funds that in equity and good conscience rightfully belong to and are owned by Gernsbacher. Defendants will be unjustly enriched if allowed to keep said Stolen Funds.

122.    Elajou is vicariously liable for Gernsbacher's claims for money had and received and unjust enrichment.    Elajou is the sole managing member, operator and agent of WPCP, and partner and agent for WPCPI.    Elajou used both WPCP and WPCPI in a manner not consistent with separate identities respecting the corporate forms, mixed funds, and expended funds for his own use. Elajou used WPCP and WPCPI to solicit the Purchase Order and payment of Purchase Funds with promises of holding those amounts in escrow until the PPE Gowns were secured and promises to return the Purchase Funds if the PPE Gowns could not be secured, but used the Purchase Funds for his and his family's immediate benefit. As such,

a.    Elajou used WPCP and WPCPI as a sham to perpetrate a fraud;

b.    Both WPCP and WPCPI were organized and operated as a mere tool or business conduit of Elajou (alter ego);

c.    Both WPCP and WPCPI were used to evade an existing legal obligation;

       d.      Both WPCP and WPCPI were used to protect against the discovery of Elajou's crime of theft;

       e.      Both WPCP and WPCPI are inadequately capitalized with the effect of creating an injustice as both entities had zero (and negative) balances before receipt of the Purchase Funds;

       f.      Elajou also used both WPCP and WPCPI for the purpose of perpetrating an actual fraud by Elajou and did perpetrate an actual fraud on Gernsbacher (individually and as assignee) primarily for Elajou's direct personal financial benefit.

Elajou should not only be held personally liable for his individual actions but also for his agency and representative actions on behalf of WPCP and WPCPI because Elajou had knowledge of and benefitted from his fraudulent acts and omissions as an agent for WPCP and WPCPI as described herein and for the acts and omissions of WPCP and WPCPI themselves.

      123.    Gernsbacher requests this Court enter a judgment against Defendants that they have/had no right to retain the Stolen Funds and must return same to Gernsbacher.

## H.    *Promissory Estoppel.*

      124.    The foregoing allegations are incorporated herein by reference.

      125.    Gernsbacher, individually and as assignee of JFN, KAHAL, Jakubowski, KFG, PPE Fund, and Constantinovici, is entitled to damages arising out of the theory of promissory estoppel, also known as detrimental reliance or justifiable reliance. Defendants (through their individual acts and omissions, partnership and agency, and Elajou/WPCP/WPCPI's direct contractual participation and involvement) confirmed and promised to perform the Purchase Order, Invoice, Confirmation Letter, Supply Agreement Refund Terms, and Refund Agreement, but failed to perform and comply with any of those agreements, despite Defendants, independently and as representatives of each other, promising to meet the obligations set forth therein. During the course of the parties' discussions, Defendants, independently and as representatives of each other, made multiple promises and representations to Gernsbacher (and his assignors) on multiple

occasions that Defendants would adhere to and perform the agreements. Gernsbacher (and his assignors) reasonably and substantially relied on those promises to their detriment, which was foreseeable by Defendants. Under the circumstances, injustice can be avoided by enforcing those promises. Despite repeated demands, Defendants have failed to follow through on those promises and have not refunded the Stolen Funds according to their agreements. Defendants should be held liable under the theory of promissory estoppel.

126.    <u>Elajou is vicariously liable for promissory estoppel.</u>    Elajou is the sole managing member, operator and agent of WPCP, and partner and agent for WPCPI.  Elajou used both WPCP and WPCPI in a manner not consistent with separate identities respecting the corporate forms, mixed funds, and expended funds for his own use. Elajou used WPCP and WPCPI to solicit the Purchase Order and payment of Purchase Funds with promises of holding those amounts in escrow until the PPE Gowns were secured and promises to return the Purchase Funds if the PPE Gowns could not be secured, but used the Purchase Funds for his and his family's immediate benefit. As such,

    a.    Elajou used WPCP and WPCPI as a sham to perpetrate a fraud;

    b.    Both WPCP and WPCPI were organized and operated as a mere tool or business conduit of Elajou (alter ego);

    c.    Both WPCP and WPCPI were used to evade an existing legal obligation;

    d.    Both WPCP and WPCPI were used to protect against the discovery of Elajou's crime of theft;

    e.    Both WPCP and WPCPI are inadequately capitalized with the effect of creating an injustice as both entities had zero (and negative) balances before receipt of the Purchase Funds;

    f.    Elajou also used both WPCP and WPCPI for the purpose of perpetrating an actual fraud by Elajou and did perpetrate an actual fraud on Gernsbacher (individually and as assignee) primarily for Elajou's direct personal financial benefit.

Elajou should not only be held personally liable for his individual actions but also for his agency and representative actions on behalf of WPCP and WPCPI because Elajou had knowledge of and benefitted from his fraudulent acts and omissions as an agent for WPCP and WPCPI as described herein and for the acts and omissions of WPCP and WPCPI themselves.

## I.    *Civil Conspiracy to Commit Conversion, Theft, Fraud, Fraudulent Inducement, and Fraud by Nondisclosure.*

127.    The foregoing allegations are incorporated herein by reference.

128.    Gernsbacher, individually and as assignee of JFN, KAHAL, Jakubowski, KFG, PPE Fund, and Constantinovici, alleges civil conspiracy between and among Defendants. Defendants (by their partnership and agency and Elajou/WPCP/WPCPI's direct participation and involvement) were parties to an unlawful combination and conspiracy, including an unlawful conspiracy to misappropriate, steal, and convert the Stolen Funds.

129.    The members of this unlawful conspiracy had a meeting of the minds as to the object of their conspiracy. In particular, Defendants agreed and understood that the object of their goal was to commit the wrongful acts detailed above for their own financial and self-promotional benefit.

130.    Defendants have committed unlawful and overt acts in furtherance of the conspiracy including, but not limited to, approving or otherwise acquiescing in the wrongful conduct described above.

131.    Defendants further supported the conspiracy by attempting to conceal the unlawful actions alleged herein. Based on this unlawful conspiracy, Gernsbacher has been damaged. Accordingly, Gernsbacher seeks to recover actual, compensatory, and consequential damages, including without limitation the Stolen Funds.

132.    Further, because the acts pursuant to the conspiracy were committed knowingly,

willfully, maliciously, fraudulently, and with gross negligence, Gernsbacher seeks to recover exemplary or punitive damages from Defendants.

## VI.

### Notice of Spoliation by Defendants

133.    In addition to Gernsbacher's causes of action against Defendants, Gernsbacher, individually and as assignees of JFN, KAHAL, Jakubowski, KFG, PPE Fund, and Constantinovici,, asserts and places Defendants and this Honorable Court on notice regarding an intent to seek a jury instruction on spoliation by Defendants, allowing for permissible inferences they may make against Defendants related to their intentional loss, alteration, and/or destruction of evidence. This includes a presumption that Defendants lost, altered, or destroyed evidence because the evidence was unfavorable to their case.

## VII.

### Exemplary Damages

134.    Gernsbacher, individually and as assignee of JFN, KAHAL, Jakubowski, KFG, PPE Fund, and Constantinovici, seeks to recover exemplary damages from Defendants (by their partnership and agency and Elajou/WPCP/WPCPI's direct participation and involvement) based on their nefarious acts as more thoroughly set out above, which are incorporated herein by reference as such were set forth verbatim. Defendants acted with actual knowledge of an extreme risk of harm to Gernsbacher but proceeded to act with conscious indifference to his rights. Accordingly, the jury should impose exemplary damages in the highest amount allowed by law to discourage such conduct by Defendants in the future and by other parties similarly situated. Such amount will be determined by the jury.

## VIII.

## Attorneys' Fees, Costs, Expenses, and Interest

135.    The foregoing allegations are incorporated herein by reference.

136.    As a result of Defendants' actions as complained of herein, Gernsbacher has been forced to retain the law firm of Barlow Garsek & Simon LLP to represent him in this action and has agreed to pay the firm reasonable and necessary attorney fees and costs.  Pursuant to Chapters 38 and 134 of the Texas Civil Practice and Remedies Code, the above-stated causes of action, and principles of equity, Gernsbacher is entitled to recover from Defendants all of his attorneys' fees, costs, and expenses for the prosecution of these actions, as well as reasonable attorneys' fees, costs, and expenses for any and all necessary appeals to other courts.

137.    Gernsbacher is also entitled to and is seeking to recover pre-judgment and post-judgment interest as allowed by law.

## IX.

## Conditions Precedent

138.    All conditions precedent to the relief being sought by Gernsbacher in this suit have been performed or have occurred.

## X.

## Jury Demand

139.    Gernsbacher demands a trial by jury on all matters and issues in this lawsuit.

## XI.

## **Prayer**

WHEREFORE, PREMISES CONSIDERED, Gernsbacher respectfully requests that Defendants be cited to appear and answer and that, upon final trial, Gernsbacher be granted judgment against Defendants, jointly and severally, for the following:

1. All actual damages, including without limitation the Stolen Funds;

2. Exemplary Damages;

3. All prejudgment and post-judgment interest at the maximum rate allowed by law;

4. All reasonable and necessary attorney's fees;

5. All reasonable and necessary costs; and

6. Such other and further relief, general or special, at law or in equity, to which Gernsbacher may show himself to be justly entitled.

September 2, 2021.

Respectfully submitted,

BARLOW GARSEK & SIMON, LLP
920 Foch Street
Fort Worth, Texas 76107
817.731.4500
817.731.6200 – Facsimile

By: _____ */s/Chris D. Collins*_____
Chris D. Collins
Texas Bar No. 24025300
ccollins@bgsfirm.com
Paul J. Vitanza
Texas Bar No. 24028100
pvitanza@bgsfirm.com

Attorneys for Plaintiff

## Certificate of Service

I, the undersigned, certify that a true and correct copy of the foregoing *Amended Complaint* was served upon all counsel of record in accordance with the Federal Rules of Civil Procedure on the 2nd day of September 2021.

*/s/ Chris D. Collins*
Chris D. Collins
